COMMONWEALTH *vs.* JOSE A. NIEVES.

Worcester. April 8, 1999. - June 21, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Constitutional Law,* Admissions and confessions. *Evidence,* Admissions and
   confessions, Voluntariness of statement, Photograph. *Practice, Criminal,*
   Voluntariness of statement, New trial, Assistance of counsel, Capital case.

At the trial of a murder indictment, the issue of the voluntariness of the
   defendant's confession was not sufficiently raised by the evidence to require
   the judge to give a "humane practice" instruction, and no substantial
   likelihood of a miscarriage of justice arose from the judge's failure to do
   so. [768-770]
There was no error in a judge's denial of a criminal defendant's motion for a
   new trial based on alleged ineffective assistance of counsel, where the
   judge found counsel's decisions with respect to the conduct of a suppres-
   sion hearing to be not unreasonable. [770-771]
A criminal defendant did not demonstrate that his trial counsel provided inef-
   fective assistance. [771]
Any alleged error in defense counsel's comments to the jury in closing argu-
   ment at a murder trial was not likely to have influenced the jury's verdict,
   in the context of the entire argument and in light of the judge's instructions
   to the jury and the evidence at trial. [771-772]
At a murder trial, the judge did not abuse her discretion in determining that
   the probative value of a photograph of the victim's body outweighed any
   possible prejudicial effect. [772-773]

INDICTMENT found and returned in the Superior Court Depart-
ment on June 14, 1993.

A pretrial motion to suppress evidence was heard by *Herbert
F. Travers, Jr.,* J.; the case was tried before *Regina L. Quinlan,*
J., and a motion for a new trial was heard by her.

*David M. Hodge* for the defendant.

*Katherine E. McMahon,* Assistant District Attorney, for the
Commonwealth.

LYNCH, J. The defendant was convicted of murder in the first
degree by reason of extreme atrocity or cruelty, and felony-

murder.[1] On appeal, the defendant claims that (1) the trial judge erred in failing to give the jury a "humane practice" instruction, sua sponte; (2) the judge improperly denied his motion for a new trial based on ineffective assistance of counsel; (3) defense counsel rendered ineffective assistance; and (4) the judge erred in admitting a photograph of the victim's body. Additionally, he requests that we exercise our power under G. L. c. 278, § 33E, to reduce his conviction or to set aside the verdict. We affirm the conviction and the denial of the motion for a new trial and decline to exercise our power under G. L. c. 278, § 33E.

*Facts.* We summarize the evidence construed in the light most favorable to the Commonwealth. The victim was twelve years old at the time of the murder. On the night of April 14, 1993, the victim's mother worked the night shift and arranged for the defendant to babysit.

The defendant was playing cards with the victim in the victim's bedroom. The defendant told the victim that he was going to kill her mother because she had given him AIDS. The victim told the defendant that she was going to tell her mother. The defendant went to the kitchen, picked up a kitchen knife, and returned to the victim's bedroom where he proceeded to rape her. He then stabbed the victim four times in the head and neck with the kitchen knife. The victim did not die immediately and began screaming. The defendant then suffocated the victim by shoving his fingers down her throat. After the victim was dead, he placed her body in a bedroom closet. The following day the victim's body was discovered in the closet.

An autopsy revealed that the cause of death was either strangulation, suffocation, or a combination of the two. The doctor who performed the autopsy believed that the victim had suffered for twenty to thirty minutes before she died. There was also evidence that the victim's vagina had been penetrated.

*The defendant's statements.* The defendant moved to suppress statements he made claiming that he was under the influence of drugs during the first police interview, and that he was experiencing drug withdrawal during the second police interview. After a hearing on the defendant's motion to suppress, the motion judge denied the motion and made the follow-

---

[1]The underlying felony, for which the Commonwealth did not obtain an indictment, was statutory rape. See *Commonwealth* v. *Eagles*, 419 Mass. 825, 839 n.16 (1995) ("underlying but uncharged felony may serve as the basis for a felony-murder conviction").

ing findings. On April 16, 1993, two State police officers, Trooper Francis Leahy and Trooper Dagoberto Martin Driggs, were assigned to investigate the case and went to the victim's mother's apartment where they saw the victim's body in the closet of the back bedroom. The police officers received information that the defendant had been with the victim on the night of April 14 through April 15.

Shortly after 10 P.M., the defendant was first questioned by Trooper Driggs and Trooper Leahy at the State police barracks in Leominster. Both the defendant and Trooper Driggs speak Spanish as their primary language. At the beginning of the interview, the officers informed the defendant who they were and what the purpose of the interview was. Trooper Driggs advised the defendant fully of his Miranda rights, both in Spanish and English. The defendant acknowledged, both in Spanish and English, that he understood his rights and did not request an attorney. At first, the defendant denied being with the victim during the approximate time of the murder. The defendant changed his story, however, when Trooper Driggs informed him in Spanish that a number of witnesses told the officers that the defendant had been with the victim on the night of her death. The defendant then admitted that he had stabbed and strangled the victim because he was angry with her mother. After a series of questions, some of the questions and responses were reduced to writing in English.[2]

At the end of the interview, Trooper Driggs went over the entire statement with the defendant in both English and Span-

---

[2]The defendant's first confession was as follows:

*Q.:*  "Jose, have you ever been to [the victim's mother's] house in Clinton?"

*A.:*  "No. I know she moved to Clinton, but I've never been there."

*Q.:*  "Jose, we have information that you were staying at [the victim's mother's] house and were babysitting her children on the day [the victim] disappeared."

*A.:*  "Yeah."

*Q.:*  "Did you hurt [the victim]?"

*A.:*  "Yes. I killed her."

*Q.:*  "Can you tell me when you killed her?"

ish. The defendant read the statement out loud in English, indicated it was correct, and signed various parts of the statement. Throughout the interview the defendant was not restrained and he appeared to be normal. There was no indication of the defendant being under the influence of alcohol or drugs. After the interview, the defendant was taken into custody.

On April 18, 1993, in response to the defendant's request, Trooper Driggs went to the Worcester County house of correction and spoke with the defendant again. Again, the defendant was advised of his Miranda rights. During the second interview, the defendant stated that he was angry with the victim's mother because she had given him AIDS, and described in detail how

A.: "I killed her Thursday morning about 2 A.M. She was talking with me in her bedroom. We were playing cards. I then strangled her and stabbed her a couple of times with a kitchen knife."

Q.: "Why did you kill her?"

A.: "I wanted to kill [the victim's mother], but I don't know why I took it out on [the victim]."

Q.: "Did you have sex with [the victim]?"

". . .

A.: "No, I did not."

Q.: "What did you do with [the victim] after you killed her?"

A.: "I carried her and placed her in the closet."

Q.: "What did you do with the knife?"

A.: "I don't know. I was nervous. It was a small kitchen knife with a blue handle."

Q.: "What was [the victim] doing when you were strangling her?"

A.: "She was telling me not to kill her."

Q.: "When you were talking with [the victim], what made you kill her?"

A.: "I was telling her how her mother had treated me and the problems that she had caused me, and I was going to kill [the victim's mother]. She told me that she was scared and was going to tell [her mother]. That is when I killed her."

he shoved his fingers down the victim's throat and suffocated her for twenty to thirty minutes. This statement was also reduced to writing.[3]

[3]The following is the defendant's statement obtained during the second interview:

> *Q.:* "Jose, I was contacted by the Worcester house of correction indicating that you were requesting to speak with me."
>
> *A.:* "Yes."
>
> *Q.:* "Jose, let me readvise you of your rights. Rights were already again, by myself, given to [you]."
>
> *A.:* "Okay."
>
> *Q.:* "After being advised of all rights, do you wish to speak with me?"
>
> *A.:* "Yes."
>
> *Q.:* "Jose, can you tell me how you killed [the victim]?"
>
> *A.:* "We were playing cards and I told her that I was mad at her mother."
>
> *Q.:* "What were you mad about?"
>
> *A.:* "She gave me AIDS. She knew that she had it, and she never told me about it."
>
> *Q.:* "What happened. What else happened?"
>
> *A.:* "I told [the victim] that I was going to kill [her mother], and she told me that she was going to tell [her mother]."
>
> *Q.:* "What else happened?"
>
> *A.:* "I had to go to the bathroom. After I came out, I picked up a kitchen knife, went back to her bedroom, and stabbed her a couple of times, but they weren't very deep. Didn't kill her."
>
> *Q.:* "What did you do next?"
>
> *A.:* "She started screaming. I then shoved my fingers down her throat and suffocated her."
>
> *Q.:* "How long did you have to suffocate her before she died?"
>
> *A.:* "I don't know, maybe 20, 30 minutes."

At trial, Trooper Driggs read the defendant's confessions to the jury. The defendant testified on his own behalf. The theory of the defense was that the defendant had falsely confessed to the murder as part of an agreement with the victim's mother because he had AIDS and wanted the victim's mother to take care of his son when he died.

1. *The voluntariness of the statements.* The defendant claims that the trial judge's failure to give a "humane practice" instruction, sua sponte, created a substantial likelihood of a miscarriage of justice. The defendant concedes that his drug use or drug withdrawal was not directly argued at trial, but claims that testimony at trial concerning his drug use and withdrawal during the period preceding his arrest and confessions made the voluntariness of his confessions a "live issue."[4,5]

---

*Q.:* "What did you do after you killed her?"

*A.:* "I was afraid [the victim's sister] had heard something, but she didn't. I then put [the victim] in the closet. You know the rest."

*Q.:* "Is there anything else you would like to tell me?"

*A.:* "No."

[4]Specifically, the defendant points to the testimony of the officers, testimony of the victim's mother, as well as his own testimony concerning his drug use which he purports transformed the issue into a live issue. The prosecutor elicited testimony from Trooper Leahy concerning his observations of the defendant during his first interrogation that the defendant did not appear to be under the influence of drugs. Trooper Driggs also testified that, during the first interrogation, the defendant did not appear to be under the influence of drugs; he was not angry or argumentative, but calm. Trooper Driggs testified that, during the defendant's second interrogation two days later at the Worcester house of correction, the defendant appeared "a lot more jittery this time."

The defendant testified that he was using drugs on a daily basis during the relevant time period. The defendant also acknowledged that he is "in control" when he is on drugs. The defendant testified that he used "a couple of bags of heroin" the following day after babysitting with the victim and her sister.

The defendant also points to a sidebar conference, where the trial judge noted defense counsel's ongoing objection to the introduction of the defendant's statements.

[5]Although the defendant does not directly challenge the motion judge's denial of his suppression motion, we note that the judge's conclusion of voluntariness was not erroneous. The motion judge determined that the defendant's confessions were voluntary despite his claim of drug intoxication and drug withdrawal. See *Commonwealth* v. *Parker*, 412 Mass. 353, 357

We conclude that the issue of voluntariness was insufficiently raised to require the judge to give a humane practice instruction. See *Commonwealth* v. *Tavares,* 385 Mass. 140, 150, cert. denied, 457 U.S. 1137 (1982), quoting *Commonwealth* v. *Alicea,* 376 Mass. 506, 523 (1978) (judge has no obligation to instruct jury on issue of voluntariness "unless it is made a live issue at trial"). The defense did not focus on involuntariness. On the contrary, the focus of the defense was that the defendant intentionally confessed to the murder as part of an agreement with the victim's mother. See *Commonwealth* v. *Brady,* 380 Mass. 44, 51 (1980) (where defendant claimed voluntariness issue was raised because of evidence that he had been drinking, issue not live where focus of defense was alibi and evidence of intoxication not substantial). A claim of involuntariness would have contradicted the defendant's theory of defense. In fact, the mere assertion that the defendant contrived the entire story, provided specific details of how the victim was murdered, and related these events in a coherent rational manner is inconsistent with the claim that his confessions were involuntary because of drug or alcohol intoxication. For the jury to accept his explanation for his confessions requires the belief that the defendant knew what he was doing. Indeed, the defendant testified at trial that he had lied in order to confuse the officer. He also testified that he is "in control" when he is on drugs. Moreover, evidence of drug use or withdrawal alone does not render an otherwise valid confession involuntary. See *Commonwealth* v. *Paszko,* 391 Mass. 164, 176 (1984); *Commonwealth* v. *Fielding,* 371 Mass. 97, 112 (1976). While there was evidence of the defendant's

(1992) ("issue of voluntariness under the common law 'humane practice' rule may be raised at trial as well as by a pretrial motion"), citing *Commonwealth* v. *Bryant,* 390 Mass. 729, 745 (1984) (pretrial hearings on motion to suppress may satisfy requirement of voir dire as stated in *Commonwealth* v. *Harris,* 371 Mass. 462 [1976]). In reviewing the judge's decision, we "accept[] the judge's subsidiary findings of fact absent clear error, give[] substantial deference to the judge's ultimate findings and conclusions of law, but independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Magee,* 423 Mass. 381, 384 (1996), quoting *Commonwealth* v. *Mello,* 420 Mass. 375, 381 n.8 (1995). We have reviewed the ruling and conclude that there was no error. The judge could properly credit the troopers' testimony that the defendant was calm during the interviews, that he did not appear to be under the influence of drugs, and that he understood the Miranda warnings. At no time did the defendant ask to speak with an attorney. There was no evidence that the defendant was forced or coerced into speaking with the troopers.

drug dependency and possible drug withdrawal, we conclude that the issue of voluntariness was not "raised with sufficient point to require an express admonition to the jury by the Court [on its own motion]." *Commonwealth* v. *Brady, supra* at 55, quoting *Commonwealth* v. *Pratt*, 360 Mass. 708, 714-715 (1972). See *Commonwealth* v. *Harris*, 371 Mass. 462, 471 n.3 (1976) (under humane practice doctrine, jury reconsideration is required whenever *credible* evidence of involuntariness is put before jury). In these circumstances, there was no substantial likelihood of a miscarriage of justice despite the judge's failure to give a humane practice instruction, sua sponte, because the judge was not obligated to do so. See *Commonwealth* v. *Burke*, 414 Mass. 252, 259-260 (1993).

2. *Denial of the motion for a new trial.* The defendant argues that the judge abused her discretion by denying his motion for a new trial based on ineffective assistance of counsel. The defendant claims that his trial counsel failed aggressively to pursue the issue of the defendant's drug use and drug withdrawal as it concerned the voluntariness of his confessions, by refusing to let him testify, and by waiving oral argument at the suppression hearing. He contends that this decision deprived him of a substantial ground of defense.

The decision to allow a motion for a new trial lies within the sound discretion of the judge and will not be reversed unless it is manifestly unjust or unless the trial was infected with prejudicial constitutional error. See *Commonwealth* v. *Hung Tan Vo*, 427 Mass. 464, 467 (1998), citing *Commonwealth* v. *Figueroa*, 422 Mass. 72, 77 (1996); *Commonwealth* v. *Russin*, 420 Mass. 309, 318 (1995). Here, because the defendant was convicted of murder in the first degree, we review these allegations under the substantial likelihood of a miscarriage of justice standard required by G. L. c. 278, § 33E, a standard more favorable to a defendant than is the constitutional standard for determining ineffective assistance of counsel. *Commonwealth* v. *Mitchell*, 428 Mass. 852, 854 (1999). Under that standard of review, we need not focus on the adequacy of trial counsel's performance, but rather examine "whether there was an error . . . (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Mello*, 420 Mass. 375, 393 (1995), quoting *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

At the hearing on his motion for a new trial, the judge rejected the defendant's contention that his trial counsel rendered ineffective assistance in his decision not to let the defendant testify at the suppression hearing. The judge found that defense counsel's explanation that he did not want to open the defendant up to impeachment at trial and did not want to reveal the defense strategy by allowing the defendant to testify at the suppression hearing was not unreasonable.[6] The motion judge was also the trial judge and her conclusion is entitled to special deference. *Commonwealth* v. *Figueroa, supra*, citing *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 32-33 (1923). We agree with the judge's conclusion and find no error. Moreover, trial counsel's waiver of oral argument at the conclusion of the hearing on the new trial motion was not manifestly unreasonable.

3. *Ineffective assistance of counsel.* The defendant further argues that his trial counsel was ineffective in failing to request a humane practice instruction, in abandoning at trial the issue of voluntariness of the defendant's confessions, and in his closing argument.

Because we have concluded that a humane practice instruction was not required and would have been inconsistent with the theory of the defense, his arguments in regard to his confessions are unavailing. *Commonwealth* v. *Wright, supra.*

The defendant also contends that his trial counsel's comments created a substantial likelihood of a miscarriage of justice because he contends they could have caused the jury to ignore the judge's instructions, particularly concerning the burden of proof and the presumption of innocence. He points to defense counsel's preliminary comments at the start of his summation, where he stated:

> "Now, I could stand up here and give you this rigmarole or business about the law, the burden of proof, and he is presumed innocent, and you should remember that, and her Honor is going to instruct you about that. The defendant has no burden to get up on the stand and tell his case or prove he is innocent. That burden is on the Commonwealth to prove it beyond a reasonable doubt to a

---

[6] At the new trial hearing, defense counsel testified that the defendant never told him that he wanted to testify. Rather, defense counsel testified that he had advised the defendant not to testify at the hearing, so as not to alert the prosecution to their anticipated defense.

moral certainty. But let's be realistic, you either believe him or you don't, and that's what this case is all about. And I suggest that you should."

We review defense counsel's comments to determine whether any alleged error was likely to have influenced the jury's conclusion. *Commonwealth* v. *Mello, supra* at 393. "Remarks made during closing arguments are considered in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992), and cases cited.

Defense counsel focused on the weaknesses of the prosecutor's case and the strengths of the defense and suggested to the jury that they believe the defendant's version of the events. Defense counsel closed by arguing that the jury could not be morally certain of the defendant's guilt. Furthermore, in light of the judge's careful instructions to the jury explaining the presumption of innocence and the Commonwealth's burden of proof, it does not appear likely that defense counsel's remarks influenced the jury's verdict.

4. *Admission of the photograph.* The defendant contends that the judge erred in admitting a photograph depicting the victim's body as it was discovered in a closet of her home.

"The admission of photographs is committed to the sound discretion of the trial judge, and we have rarely reversed a conviction because of the introduction of photographs of a victim." *Commonwealth.* v. *Meinholz*, 420 Mass. 633, 635 (1995). "Whether the photograph[] [was] 'so inflammatory in nature as to outweigh [its] probative value and preclude [its] admission is a question to be determined by the trial judge in the exercise of [her] sound discretion.' " *Commonwealth* v. *Ramos*, 406 Mass. 397, 407 (1990), quoting *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 279 (1962). Here, the judge did not abuse her discretion in determining that the probative value of the photograph outweighed any possible prejudicial effect. The photograph depicted the victim's body crouched in a closet, wrapped in a blanket with a sneaker placed on top of her, which corroborated the details of the defendant's confessions. Thus, the photograph was probative on the issue of the defendant's credibility where he claimed that he had falsely confessed as part of an agreement with the victim's mother. *Commonwealth* v. *Merola*, 405 Mass. 529, 544-545 (1989). It was also probative of consciousness of guilt. *Commonwealth* v. *Meinholz, su-*

*pra* at 636 (photographs depicting how victim's body was encased in plastic and tied up with rope before being buried in defendant's cellar were found relevant to issue of extreme atrocity or cruelty, deliberate premeditation, and consciousness of guilt), and cases cited. Consequently, there was no error.

5. *Relief under G. L. c. 278, § 33E.* The defendant requests that we order a new trial or reduce his verdict. We have reviewed the entire record pursuant to G. L. c. 278, § 33E, and conclude that a reduction in the verdict or a new trial is not required.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*