## Commonwealth *vs.* Miguel Gomez.

Hampden. December 6, 2007. - February 21, 2008.

Present: Marshall, C.J., Ireland, Spina, Cordy, & Botsford, JJ.

*Homicide. Practice, Criminal,* Capital case, New trial, Assistance of counsel. *Malice.*

At the trial of an indictment charging murder in the first degree, the judge did not err in denying the defendant's motion for a required finding of not guilty, where the Commonwealth presented sufficient evidence that the defendant planned to kill the victim. [709-711]

A criminal defendant convicted of murder in the first degree failed to demonstrate that his trial counsel had rendered ineffective assistance in cross-examining the Commonwealth's key witness [711-713] or in failing to elicit certain allegedly exculpatory testimony during direct examination of the defendant [713].

Indictments found and returned in the Superior Court Department on May 31, 2001.

The cases were tried before *Lawrence B. Wernick,* J., and a motion for new trial, filed on December 22, 2005, was heard by *Constance M. Sweeney,* J.

*Stephen Paul Maidman* for the defendant.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

Ireland, J. In 2002, a Hampden County jury convicted the defendant, Miguel Gomez, of murder in the first degree based on deliberate premeditation. He also was convicted of unlawful possession of a firearm and unlawful possession of a firearm or ammunition without a firearms identification card in violation of G. L. c. 269, § 10 (*a*) and (*h*).[1] On appeal the defendant

---

[1]After he was convicted of the two firearms violations, the defendant also pleaded guilty to the sentencing enhancement provisions of G. L. c. 269, § 10G (*b*), for which he was sentenced to from ten years to ten years and one day to run concurrently with his sentence of life in prison without the possibility of parole on his murder conviction.

argues that the trial judge erred in denying his motion for a required finding of not guilty, that his motion for a new trial and for an evidentiary hearing was erroneously denied, and that we should reduce the verdict or order a new trial. Because we conclude that there is no merit to the defendant's claims of error and discern no reason to exercise our power under G. L. c. 278, § 33E, we affirm the defendant's convictions.

*Background.* On May 3, 2001, the defendant shot and killed the victim, who was on the fourth floor of 273 Maple Street in Holyoke, a building in which drugs were sold. At trial, the defendant did not deny killing the victim, but he claimed that he had acted in self-defense. After the close of the Commonwealth's evidence the defendant orally moved for a required finding of not guilty of murder in the first degree, which the judge denied. He renewed the motion at the close of all evidence, and the motion again was denied. After his convictions, the defendant timely appealed. He also filed a motion pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), which was denied.

In 2005, the defendant filed a motion for a new trial and for an evidentiary hearing, claiming ineffective assistance of counsel. The motion was remanded to the Superior Court for disposition. Another judge (motion judge)[2] issued a written decision denying the defendant's motion after holding a nonevidentiary hearing. The defendant appealed from the denial of his motion.

*The Commonwealth's case.* The jury were warranted in finding the following facts. At the time of his death, the victim was staying in apartment 4B at 273 Maple Street, although he did not pay rent. The defendant was a tenant of apartment 2D in the building.[3] The defendant, the victim, and Michael Pena, a friend of the victim, all sold drugs in the building. Pena, who testified for the Commonwealth pursuant to a cooperation agreement, stated that a dispute arose on May 2, 2001, when Pena argued with the defendant over a customer to whom the defendant was

[2]The motion judge reported in her written decision and order on the defendant's motion for a new trial that the trial judge was deceased.

[3]At trial, the defendant claimed that he had given the landlady a deposit on his apartment and she let him move in there, although the apartment was being renovated.

selling drugs. A fight ensued, which the victim joined. The defendant was beaten and bruised and chased out of the building. When the defendant returned to the building later that same day, the victim, holding a .357 magnum revolver that he sometimes carried, chased the defendant out of the building and told him never to come back.

The next evening, Pena and the victim were in apartment 4B, about to smoke marijuana, when someone knocked on the apartment's door. The victim, dressed in shorts but no shirt, went to answer it. Pena had not seen the victim's gun at all that day. Pena heard "some shots," saw some flashes, and ran to see what had happened. He saw the victim staggering back toward the bedroom. Pena ran into the hallway and saw the defendant running away. Pena went back into the apartment and tried to apply pressure to the victim's wounds, becoming covered in the victim's blood. Pena told a woman in the building to contact the police, and when Pena saw the police having trouble getting into the building, Pena started running down the stairs, without stopping, screaming hysterically. He met police officers, who by then had obtained the building's security code, on the landing at the second floor. Pena was handcuffed. He told the officers that the victim was wounded and then vomited. He was taken to the police station where he identified the defendant from a photographic array.

In the meantime, a taxicab driver observed the defendant running out of the building while holding a gun. The police found the defendant in an empty apartment in an abandoned building on Elm Street with the door barricaded. The defendant was in a bedroom closet trying to hide in a space above the ceiling tiles. After police officers pulled him down, he indicated that a gun was up on top of the ceiling tiles. Officers retrieved the gun (as well as a knife the defendant had in his hand) and ballistics testing revealed that the shot that killed the victim was fired from the defendant's gun.[4]

As the officers were subduing the defendant, he asked about the victim's condition. At the police station, he waived his Miranda rights and gave a statement to police. In the statement,

[4]The defendant had a knife in his hand when police officers pulled him down, but he made no attempt to harm any of the officers.

which was admitted in evidence and read to the jury, the defendant spoke of the fight on May 2, including the fact that the victim put a gun to the defendant's head and told him not to come back. The defendant said, "They thought it was the end of it," but instead, on the night of May 3, he retrieved a gun he kept hidden by a river in South Hadley. He knew that, when he went back to the building, he "was going to have some beef." The defendant further stated that as he passed a woman in the hallway of the building she said, "Please . . . don't do it," but that he "just kept going" and "went up there and saw the guy that jumped me and I blasted him." The defendant also stated, "I had the gun in my hand as I was walking up the stairs. I seen him and he tried to run in the house. So I shot him right there. I shot him twice. . . . After I shot him, I ran out the back." He stated that he ended up in a vacant apartment on Elm Street where he changed his clothes, giving the ones he wore during the shooting to a friend "to get rid of."[5]

Two projectiles that were fired from the defendant's gun were recovered, one from the victim's body and one near the bathroom in apartment 4B near where the victim was shot. The victim's gun, a .357 magnum revolver, was recovered in apartment 2B. The weapon was not loaded and six rounds of .357 ammunition were found in the back pocket of the victim's pants. Police also recovered a bullet that was determined to have been fired from the victim's gun in the floor of apartment 4A (next door to apartment 4B), but a ballistics expert testified that the shot could only have come from inside apartment 4A. There was no evidence that the victim was in apartment 4A at the time he was shot by the defendant.[6]

The medical examiner testified that the victim suffered wounds to both the chest and the back of the right forearm near the wrist. She also testified that a single bullet wounded the victim in both places, indicating that the victim had his right hand up against his chest at the time of the shooting.

---

[5]In the statement, the defendant said that his gun jammed. A State police ballistics expert later testified that the gun was jammed when he first tried to examine it.

[6]Although not a part of the Commonwealth's case, on cross-examination, the defendant, who claimed that the victim shot at him first, stated that the victim was not in apartment 4A when he fired at the defendant.

Pena testified that, although he saw the defendant leave the building, he went back into apartment 4B to tend to the victim. He also denied having the victim's gun with him on the day of the shooting, or stopping in any apartment on his way down the stairs to meet the police.

*The defendant's case.* The defendant testified at trial, called one witness, and played a recording of a 911 call to the police on the night of May 3, where the caller said, *"They* are shooting in the hallway" (emphasis added). The defendant did not deny shooting the victim, but claimed that he had acted in self-defense.[7] We view evidence pertaining to self-defense in the light most favorable to the defendant. *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980).

The defendant's witness testified that he saw the defendant outside the Maple Street building on May 2. The defendant was clearly beaten up. The witness, who was going into the building to sell heroin, met the victim inside. The witness testified that the victim told him that if the defendant ever returned to the building, the victim would kill him. The victim repeated the statement to this witness approximately three hours later, but this time the victim was holding a gun. On the night of the shooting, the witness was on the fifth floor of the building and heard three shots.

The defendant testified that he was a drug user and drug dealer who lived in apartment 2D but, because of renovations, was storing his clothes in apartment 4B. He stated that he lived alone. He testified that his daily use of "crack" cocaine made him "always nervous, paranoid, and hallucinating."

The defendant related the May 2 fight over the drug customer. The defendant testified that after Pena swung at him and he hit back, the victim joined in the fight. He testified that Pena and the victim threw him down a flight of stairs. Although the victim was not carrying a weapon at that point in time, the victim told the defendant to "get the fuck out of the building." Later that night, the defendant returned and met the victim on the

---

[7]In addition to receiving an instruction on self-defense, the jury were instructed that the Commonwealth had to prove, beyond a reasonable doubt, that the defendant was not acting in the heat of passion on reasonable provocation, sudden combat, or excessive force in self-defense.

second-floor landing. The victim held a gun to his head, but a friend of the victim prevented the victim from shooting the defendant. The victim told the defendant to "get the fuck out of the building" and said that, if the defendant ever came back, the victim would shoot him. The defendant left the building.

The defendant returned to the building the next day to get his clothes and to be sure his girl friend was not in apartment 4B. He carried an automatic pistol that belonged to him to be "cautious." He asked men outside the building if the victim was inside and they told him no. When the defendant got to the fourth-floor landing he saw two people involved in a drug transaction. When the customer turned, the defendant saw that the other person was the victim. The defendant stated that the victim had a gun tucked in his shorts, which he took out and fired at the defendant. The defendant, feeling fear and panic, turned and ran, shooting twice. The defendant stated that he heard someone chasing him as he ran away, but did not know who it was. He testified that he was afraid it was Pena. The defendant said that when he went to the police station he wanted to take responsibility for the victim's death. The defendant stated that the reason his police statement did not say that the victim had a gun was because he did not know if he had to give details to the police at that time, because he was just taking responsibility for the shooting.

In addition to this evidence, through his cross-examination of Pena and in his closing argument, defense counsel suggested that Pena had placed the victim's gun in the second-floor apartment while he was on his way down the stairs to meet the police.

*Discussion.* 1. *Required finding of not guilty.* The defendant claims that the judge erred in denying his motion for a required finding of not guilty at the end of the Commonwealth's case and at the close of all evidence because the Commonwealth's evidence was insufficient to show that the defendant acted unlawfully.

In considering the denial of a motion for a required finding of not guilty, the reviewing court must determine whether the Commonwealth's evidence and the reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth, were sufficient to persuade a rational jury of the existence of all the elements of the crime charged beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-

677 (1979), quoting *Commonwealth* v. *Sandler*, 368 Mass. 729, 740 (1975). See *Commonwealth* v. *Stewart*, 411 Mass. 345, 349-350 (1991) (all permissible inferences are drawn in favor of Commonwealth); *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989), quoting *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977) (inferences "need only be reasonable and possible . . . not necessary or inescapable").

In order to prove murder in the first degree under the theory of deliberate premeditation, the Commonwealth had to prove that the defendant committed the killing with malice. Murder with deliberate premeditation requires the Commonwealth to prove deliberation and premeditation, a decision to kill, and a killing in furtherance of the decision. *Commonwealth* v. *Duran*, 435 Mass. 97, 111-112 (2001), quoting *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998).

Here the Commonwealth presented sufficient evidence that the defendant planned to kill the victim. He told police that, after the altercation with the victim on May 2, "[t]hey thought it was the end of it," but instead the defendant retrieved his gun, went back to the apartment on May 3 with the gun in his hand, "blasted" the victim who was trying to run back into the apartment, and then went to the Elm Street apartment where he changed his clothes and had a friend "get rid of" the clothes he had on when he shot the victim. As set forth above, the defendant's statement was corroborated by Pena's testimony; testimony of the taxicab driver who saw only the defendant, who was holding a gun, on Maple Street; testimony of police officers who met Pena on the second-floor landing; ballistics evidence; and the medical examiner's conclusion that the victim was defensively holding his hand against his chest when he was shot.

Nor did the Commonwealth's case deteriorate once the defendant presented his case. *Commonwealth* v. *Morgan*, 449 Mass. 343, 349 (2007), quoting *Commonwealth* v. *Sheline*, 391 Mass. 279, 283 (1984). Deterioration only occurs where the Commonwealth's evidence of necessary elements "is later shown to be incredible or conclusively incorrect." *Commonwealth* v. *O'Laughlin*, 446 Mass. 188, 203 (2006), quoting *Kater* v. *Commonwealth*, 421 Mass. 17, 20 (1995). Where, as here, the evidence at trial "turns solely on the credibility of [the

defendant's] witnesses," the Commonwealth's case cannot deteriorate. *Commonwealth* v. *Platt*, 440 Mass. 396, 404 (2003), citing *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992). The weight and credibility of the evidence is the province of the jury. *Commonwealth* v. *Nardone*, 406 Mass. 123, 129-130 (1989). See *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), quoting *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978) (where conflicting inferences from evidence possible, jury determine truth). Moreover, here, where the defendant admitted at trial that he told the police that he blasted the victim, and also admitted that he never told police that the victim had a gun or that the victim shot at him, the Commonwealth's case did not deteriorate and could well have been strengthened. *Commonwealth* v. *Nolin*, 448 Mass. 207, 216-217 (2007). There was no error.

2. *Motion for a new trial.* The defendant claims that the motion judge erred in denying his motion for a new trial on grounds of ineffective assistance of counsel, and in denying his request for an evidentiary hearing. The denial of a motion for a new trial is reviewed for abuse of discretion, and the ruling will be affirmed unless "no conscientious judge, acting intelligently, could honestly have taken the view expressed by [her]." *Commonwealth* v. *Goodreau*, 442 Mass. 341, 348 (2004), quoting *Commonwealth* v. *Ira I.*, 439 Mass. 805, 809 (2003). Where "the motion judge did not preside at trial, we defer to that judge's assessment of the credibility of witnesses at [a] hearing on the new trial motion, but we regard ourselves in as good a position as the motion judge to assess the trial record." *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). Where a motion for a new trial is considered in conjunction with a defendant's appeal from a conviction of murder in the first degree, it will be reviewed under the substantial likelihood of a miscarriage of justice standard pursuant to G. L. c. 278, § 33E. *Commonwealth* v. *Morgan*, *supra* at 353. Where, as here, the defendant alleges ineffective assistance of counsel, the "standard required by G. L. c. 278, § 33E, [is] more favorable to a defendant than is the constitutional standard for determining ineffective assistance of counsel." *Commonwealth* v. *Nieves*, 429 Mass. 763, 770 (1999), citing *Commonwealth* v. *Mitchell*, 428 Mass. 852, 854

(1999). We examine "whether there was an error . . . (by defense counsel . . .) and . . . whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Nieves, supra,* quoting *Commonwealth* v. *Mello,* 420 Mass. 375, 393 (1995).

a. *Cross-examination of the Commonwealth's witness.* The defendant submitted an affidavit in support of his motion for a new trial in which he claimed that trial counsel was aware that, when the defendant was fleeing the shooting, he looked behind him and saw the Commonwealth's most important witness against him, Michael Pena, chasing him with the victim's gun in his hand. He also offers, through an affidavit of appellate counsel, handwritten notes from trial counsel which the defendant claims demonstrate that trial counsel knew that Pena shot at the defendant as he was chasing him. The defendant argues that if trial counsel had more effectively cross-examined Pena he "[p]erhaps" could have elicited these facts. There was no error because, as the motion judge concluded, there is nothing in the record to support the defendant's presumptions that defense counsel could have elicited this information from Pena.

As the motion judge pointed out, on direct examination Pena denied seeing the victim with a gun on the day of the murder. Pena also stated, on cross-examination, that he saw no weapons in apartment 4B that day. When asked on cross-examination whether he was carrying anything, including the victim's gun, or stopped in any apartment on his way downstairs to meet the police, Pena said, "No," but agreed that he passed by apartment 2B. We agree with the motion judge that the defendant "has not shown that if trial counsel prodded Pena further or if he used a different line of questioning, Pena would have testified that he chased [the defendant] with [the victim's] gun." In addition, as the motion judge noted, the defendant's claim "contradict[s] his trial testimony that he heard someone chasing him but he did not know who it was, and his statement to police, which made no mention of anyone chasing him. Further, [the defendant's] trial testimony and his affidavit both differ from the handwritten notes of trial counsel, as [only] the notes indicate that Pena fired shots at [the defendant] while chasing him."

Contrary to the defendant's contention, cross-examination to

elicit repeated denials from Pena would not have added anything to the defendant's case. Counsel's questions are not evidence; only the answers of witnesses are. *Commonwealth* v. *Ploude*, 44 Mass. App. Ct. 137, 142 (1998). In addition, counsel attacked Pena's credibility on cross-examination by eliciting that Pena was a drug user and dealer; that he had at least three pending drug charges, some of which carried mandatory sentences; and that Pena was hoping his cooperation would lead to no prison time. He also questioned Pena about inconsistencies in his two statements to police. Moreover, the taxicab driver saw only the defendant running from the building with a gun in his hand, and there was no evidence that any other bullets or projectiles, other than those discussed above, were recovered from the building.

b. *Direct examination of the defendant.* The defendant also claims that, had trial counsel asked him the proper questions, he would have testified that Pena was chasing him while holding the victim's gun. As the motion judge concluded, this argument has no merit because trial counsel gave the defendant the opportunity to provide this information to the jury when he asked, "Do you know who was chasing you?" The defendant answered, "No, sir." We agree with the motion judge that the defendant's affidavit on this matter is not credible.

Moreover, we note that, as the defendant did not testify, and does not claim, that Pena was present when the defendant shot the victim, even if Pena pursued the defendant after the victim was shot, such evidence would not have accomplished anything material for the defense. See *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). Because the defendant's justification for the shooting was self-defense against the victim's aggression, what Pena did after the shooting was irrelevant. There was no error.[8]

3. *Review pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to our obligation under G. L. c. 278,

---

[8]Because we conclude, as did the motion judge, that trial counsel committed no error, the motion judge did not err in denying the defendant's request for an evidentiary hearing. See *Commonwealth* v. *Goodreau*, 442 Mass. 341, 348-349 (2004); *Commonwealth* v. *Britto*, 433 Mass. 596, 608 (2001) (evidentiary hearing required if motion for new trial and affidavit raise substantial issue).

§ 33E, and discern no reason to exercise our power to reduce the murder verdict or order a new trial.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*