COMMONWEALTH vs. GREGORY M. DONNELLY.

No. 90-P-1502.

Middlesex. April 9, 1992. - August 18, 1992.

Present: WARNER, C.J., PERRETTA, & IRELAND, JJ.

*Grand Jury. Practice, Criminal*, Grand jury proceedings, Dismissal. *Evidence*, Prior inconsistent statement, Testimony before grand jury, Impeachment of credibility, Hearsay. *Witness*, Impeachment.

At the trial of indictments for motor vehicle homicide while under the influence of intoxicating liquor and for operating a motor vehicle while under the influence of intoxicating liquor so as to cause serious bodily injury, the judge erred in precluding the defendant's use, for impeachment purposes, of certain diagrams made by an investigating State police officer to illustrate his testimony before the grand jury [196-197]; moreover, on the trial record, at least one of the diagrams was admissible in evidence for its probative value under principles articulated in *Commonwealth* v. *Daye*, 393 Mass. 55, 65-75 (1984), and, where the excluded material would have supported the defendant's contentions, the error was not harmless [198-199].

Dismissal of various indictments arising from a motor vehicle collision was not required by the Commonwealth's failure to present to the grand jury certain witnesses' statements allegedly favorable to the defendant, where, even if so viewed, the omitted statements would merely have reflected a point of view conflicting with that of witnesses whose testimony favored the Commonwealth's position. [199-201]

INDICTMENTS found and returned in the Superior Court Department on July 18, 1989.

A motion to dismiss was heard by *James F. McHugh*, J., and the cases were tried before him.

*Carol A. Donovan*, Committee for Public Counsel Services, for the defendant.

*Marguerite T. Grant*, Assistant District Attorney, for the Commonwealth.

The defendant, pro se, submitted a brief.

PERRETTA, J. On June 3, 1989, the defendant was involved in a four-car accident on Route 2 in Concord. Steven Danielson and his teenage son died as a result of the crash, and another man sustained serious injuries. The defendant was not hurt. At trial, it was the Commonwealth's theory of guilt that the defendant crossed from the right to the left westbound lane to sideswipe the Danielson vehicle, a pickup truck, and force it into oncoming easterly traffic where it collided with another truck. Although the defendant was acquitted of manslaughter, the jury found him guilty of motor vehicle homicide while operating under the influence of liquor and causing serious injury while operating under the influence of liquor. He argues on appeal that the trial judge erroneously excluded evidence of prior inconsistent statements and that the Commonwealth, in obtaining the indictments against him, misled the grand jury. Although there is no basis for ordering dismissal of the indictments, we conclude that it was error to deny the defendant the probative use of prior inconsistent statements made by the investigating officer before the grand jury. However, as the probative value of those statements is limited to the issue of who caused the deaths and injury, we reverse only the convictions for motor vehicle homicide while under the influence of liquor and causing serious injury while under such influence.[1]

1. *The pertinent facts.* All those parts of Route 2, which runs east-west, here in discussion have four lanes, two for each direction of traffic. We need not recite the facts concerning the defendant's consumption of liquor. It is enough to state that there was an abundance of evidence to show that he was intoxicated while driving his white Plymouth Reliant automobile westbound on Route 2 at about forty to fifty miles an hour. He was changing lanes, tailgating, and weaving in and out of traffic.

Returning home with his son after a soccer game, Danielson was also proceeding west on Route 2. He was driving a Ford Ranger pickup truck. The defendant met up with him

---

[1]The defendant was also found guilty of operating a motor vehicle so as to endanger, operating while under the influence of liquor, and assault.

at an intersection where a line of cars was waiting for the light to change. When it did so, Danielson and the defendant moved forward. They maintained the same rate of speed and changed lanes simultaneously. According to various witnesses, Danielson was attempting either to get out of the defendant's path or to prevent the defendant from overtaking and passing him. They proceeded along in this fashion for quite some distance.

We move forward to the scene of the accident. As the two vehicles approached an intersection, the pickup truck was in front of the car. The light was yellow, and Danielson slowed as if to stop. Danielson's pause enabled the defendant to cut from the left to the right and around the pickup truck. The defendant was now ahead of Danielson, but his lead was brief. As the two drivers proceeded through the intersection, Danielson cut to his left, accelerated his pickup truck, and passed the defendant. At the next intersection, the defendant maneuvered into the right lane.

This is the point at which there is conflict in the evidence. The Commonwealth presented evidence to show that rather than pass the pickup truck on its right, the defendant veered into the left lane to sideswipe it. His car made and maintained contact with the front right fender of the pickup truck. Holding to his left, the defendant pushed, or caused, Danielson to cross over the center line into the eastbound lane where he hit an oncoming truck. The driver of the truck was seriously injured, and Danielson and his son were killed. The defendant continued ahead for about seventy feet, skidded out of control, crossed into oncoming traffic, hit a station wagon, and came to rest in the right eastbound lane.

It was the defendant's theory of defense that Danielson had engaged him in a "dogfight." Witnesses had observed the two vehicles changing lanes and passing each other. In the moments leading up to the crash, the defendant was in the right lane and Danielson in the left. Danielson was swerving towards the defendant, as if to prevent the defendant from passing him or to push the defendant to the shoulder of the road. The defendant claimed that Danielson over-

steered out of his swerve towards him and that as a result of that maneuver, the pickup truck crossed over the double center-line and entered the eastbound lane.

When State trooper Peter Sennott arrived at the scene of the accident, he interviewed witnesses, saw the position of the vehicles, and observed and measured tire marks in the road. State trooper Steven Charette, trained in the field of accident reconstruction, arrived shortly after Sennott. He inspected the physical evidence, took measurements, and directed the taking of photographs of the tire marks in the road.

At trial, Sennott related his observations to the jury and identified the many photographs of the tire marks. While testifying with the aid of the photographs, Sennott drew the path of the various tire marks on a blackboard.[2] Although not brought out on either Sennott's direct or cross-examination, Sennott had drawn three diagrams in the course of his investigation. As will be discussed, these diagrams depict tire marks from the defendant's car in the right westbound lane and, when coupled with the testimony of the defendant's expert witnesses, support the defendant's claim that Danielson oversteered out of his swerve to the right and towards the defendant.

Charette, testifying as an accident reconstruction expert, followed Sennott. With the aid of a chalk that he had prepared for trial, marked "R" for identification, Charette explained the significance of the tire marks depicted in the photographs.[3] He stated that, at the accident scene, he saw tire marks left by the pickup truck which were about ten to twelve feet from the line which separated the two westbound lanes. These marks ran in a straight line in the left west-

[2]Knowing that Charette would be testifying as an accident reconstruction expert, the trial judge remarked to the prosecutor at side bar that Sennott's testimony was needlessly "redundant." The prosecutor agreed but explained that because he expected defense counsel to argue that Charette's work was "shoddy," Sennott's testimony was a necessary exercise to credit the accuracy of Charette's observations and, hence, his opinion.

[3]This exhibit, "R" for identification, was on display before the jury and was eventually sent to the jury room by agreement of counsel. Although we called for but were unable to obtain this chalk, there is no dispute that it did not depict the tire marks which, as will be seen *infra*, are in dispute.

bound lane for about eighty feet before curving to the left towards oncoming traffic. Because the marks showed no visible tread, Charette concluded that they were brake and not yaw marks.[4] From his observation of what he believed to be skid marks from the pickup truck, Charette opined that the Danielson vehicle was in a straight braking skid when an external force pushed it to the left and off its course. He was not of the view that Danielson had steered into the eastbound lane because "evidence for steering is not there," that is, he saw no yaw marks from the pickup truck.

Turning to the tire marks left by the defendant, Charette stated that he saw yaw marks which began, faintly, to the left of the line between the two westbound lanes. The yaw marks continued in a curve to within about two feet of the right side of the road and then curved back over to the left westbound lane. At this point, the marks became darker. Charette attributed these marks to a sideways slide by the defendant's car, on its sidewalls, into oncoming traffic.

These marks led Charette to conclude that the defendant's car was in the left westbound lane when it began its yaw, and that it was in that lane from the moment it made contact with the pickup truck. It was Charette's opinion that had the defendant's car swerved from the right to the left lane, there would have been yaw marks to show that fact.

Having placed the defendant in the left westbound lane at the moment of impact with the pickup truck, Charette next stated that the defendant's car left yaw marks in that lane about seventy feet farther west from the point where Danielson crossed into oncoming traffic. Calculating that it would have taken the defendant about one and one-half seconds to travel seventy feet and taking the average driver's reaction time of three-quarters of a second, Charette concluded that the defendant had time to apply his brakes before his yaw

---

[4]Charette explained that a yaw mark is a curved tire mark with diagonal striations caused by a hard turning movement of a vehicle. A brake or skid mark is a straight tire mark, with no diagonal striations, in which a tread is visible.

began. There were, however, no skid marks from his car in that seventy-foot interval.

On cross-examination, Charette acknowledged that none of the photographs showed the tire marks from the defendant's car about which he had testified on direct and which appeared on the chalk ("R") that he had prepared for trial: the beginning of the yaw which caused the defendant to cross into the left eastbound lane and hit a station wagon. His credibility was impeached with his grand jury testimony that there were tire marks from the pickup truck in the westbound lane which were caused by a "hard turn to the left."[5]

We capsulize the evidence and its thrust as of the close of the Commonwealth's case. Danielson was in the left lane, about ten to twelve feet from the line between the westbound lanes, and the defendant was in the right lane. The defendant crossed over the line into the left lane, sideswiped and pushed the pickup truck out of that lane into oncoming traffic, continued forward in the left lane without braking for seventy feet, and then skidded out of control and over into the eastbound lane. There was nothing to show that the defendant's car was in the right westbound lane when it began its yaw, eighty-five feet in length, from that lane to cross over into easterly traffic. Although this yaw was clearly depicted on the three diagrams which Sennott had drawn, the diagrams were not used during the cross-examination of either Sennott, by choice of defense counsel, or Charette, by ruling of the trial judge.[6] The defendant called Sennott as his first witness.

It was established by Sennott that he had made a written report and had drawn three diagrams, all of which made ref-

_____

[5]This statement to the grand jury is inconsistent with Charette's testimony at trial, "evidence for steering is not there," which partly provided the basis of his opinion that Danielson was in a straight course when he was pushed from the right.

[6]During Charette's cross-examination, defense counsel had Sennott's diagrams marked "U," "V" and "W" for identification. He then showed them to Charette, who refused to acknowledge them as being fair and accurate because they had not been drawn to scale. Consequently, the trial judge would not allow defense counsel to use the diagrams in cross-examining Charette.

erence to tire marks from the defendant's car. Sennott further stated that he had referred to those tire marks in his grand jury testimony and that he used his diagrams in explaining his testimony. Then began a series of objections by the Commonwealth to all questions put to Sennott concerning the tire marks reflected in his written report, grand jury testimony, and three diagrams.

Because Sennott insisted that the diagrams were not fair and accurate but were, instead, rough sketches that he had made for his own purposes, the trial judge would not allow any use of them. He acknowledged that the diagrams were critical to the defendant's case, but he sustained all the Commonwealth's objections to their use and any mention of them on the grounds of lack of foundation and hearsay. Defense counsel made an offer of proof and argued that Sennott's diagrams and grand jury testimony were admissible for probative consideration under *Commonwealth* v. *Daye*, 393 Mass. 55 (1984), which established the rule that prior inconsistent statements of a witness at trial are admissible in evidence for their probative value if they were made under oath before a grand jury.

Two accident reconstruction experts testified for the defendant. The first stated that Charette's chalk, "R," did not accurately reflect the marks depicted in the photographs. The marks from the pickup truck which appeared in the photographs were not consistent with the Commonwealth's theory that the defendant's car crossed into the left westbound lane to push the pickup truck into oncoming traffic. The photographs did not show any marks having characteristics of an impact or push, and there was nothing in the photographs to indicate that the defendant's car was in the left westbound lane at the time the pickup truck went out of control. It was this expert's opinion that the marks in the pictures were consistent with the pickup truck having gone out of control as a result of a series of hard left turns.

This opinion was shared by the defendant's second expert. He regarded Charette's chalk, "R," as an inaccurate reflection of the tire marks depicted in the photographs. The

marks in the pictures were curved whereas they appeared straight on the chalk. Because there was no physical evidence, such as a scuff mark or undercarriage debris, to indicate any impact between the defendant's car and the pickup truck, the witness excluded the possibility that the yaw made by the pickup truck was caused by contact with the defendant's car. It was his opinion that all the evidence was consistent with a yaw maneuver by the pickup truck caused by hard oversteering to the left, carrying it into oncoming traffic.

2. *Probative use of the grand jury testimony.* We have recited the evidence presented in some detail in order to show that Sennott's testimony at trial was inconsistent with his grand jury statements in respects important to the theory of the defense.

Both troopers testified before the grand jury. To enable the grand jury to follow and to understand his testimony, Sennott presented each of the jurors with a copy of at least one of the diagrams (marked as exhibit "U" for identification) of the accident. This diagram (as well as the other two which were marked "V" and "W," see note 6, *supra*) clearly depicts tire marks, measured to be eighty-five feet in length, from the defendant's car. These marks are west of the point where Danielson crossed over to hit the oncoming traffic. They begin in the right westbound lane and then curve to cross over into the left eastbound lane.

According to Sennott, these marks were made by the defendant's car. He explained that after the defendant crossed from the right to the left lane to sideswipe the pickup truck, he returned to the right lane "almost striking the curbing," then cut sharply to his left, "leaving approximately eighty-five feet of a yaw mark, crossing the left travel lane, the center lines and into the eastbound left travel lane . . . ."

Charette told the grand jury that he saw the eighty-five foot yaw mark. He attributed it to having been made by the defendant after hitting the pickup truck, going some distance, "I don't really know what he was doing," then heading into the right westbound lane "in a direction that would lead

him to go off the road and at that point he turns hard to the left, putting down a yaw mark . . . ."

Although these explanations of the disputed tire marks are consistent with the Commonwealth's theory of the defendant's guilt, the fact remains that the marks on the diagrams place the defendant's car, after the point of contact with the pickup truck, in the right lane. The explanations of how they were made are inconsistent with the troopers' testimony at trial which was to the effect that the defendant was in the left lane when he hit the pickup truck and when he skidded out of control and into eastbound traffic. "[I]t is not necessary that there should be a contradiction in plain terms. It is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict." *Commonwealth* v. *Thayer*, 20 Mass. App. Ct. 234, 237 (1985), quoting from *Commonwealth* v. *West*, 312 Mass. 438, 440 (1942). See generally Liacos, Massachusetts Evidence 135-136 (5th ed. 1981).

Precluding use of the diagrams to impeach Sennott's credibility on the basis of a lack of foundation and hearsay was error. When used for impeachment purposes, prior inconsistent statements are not offered for the truth of the matter therein asserted, and, therefore, they are not hearsay. Sennott's insistence that the diagrams were not fair and accurate should have been deemed as no more than a permissible explanation for the inconsistency rather than as a basis for precluding their use. See *Commonwealth* v. *Basch*, 386 Mass. 620, 623-624 (1982), and cases and authorities therein cited. Additionally, the fact that the prior inconsistent statement may be Sennott's opinion is irrelevant. See *McGrath* v. *Fash*, 244 Mass. 327, 330 (1923). Moreover, as the contradictory statements went to the main issue, the trial judge had no discretion to preclude their use for impeachment purposes. See *Commonwealth* v. *West*, 312 Mass. at 440; *Assessors of Pittsfield* v. *W.T. Grant Co.*, 329 Mass. 359, 360 (1952); *Commonwealth* v. *A Juvenile*, 361 Mass. 214, 218 (1972).

If allowed probative consideration, the diagrams give support to the opinions of the defendant's expert witnesses. The fact that the use of the diagrams should have been allowed for impeachment purposes supports our conclusion that at least one of them, "U," was entitled to probative consideration. "[J]uries cannot, and perhaps should not, be expected to discriminate between impeachment and probative use of a prior inconsistent statement, and . . . formally conferring probative status to such statements does no more than legitimize current practice." *Commonwealth* v. *Daye*, 393 Mass. at 69.

It is settled that the *Daye* rule is not limited to identification testimony. See *Commonwealth* v. *Berrio*, 407 Mass. 37, 45 (1990). Further, we see nothing in *Daye* which suggests that its rule can be invoked only by the Commonwealth. Rather, *Daye*, 393 Mass. at 71, is based, in part, upon the conclusion that if prior inconsistent statements to the grand jury are given probative value, the "truth-seeking function of trials may be enhanced rather than diminished."

To ensure that the hearsay will be sufficiently reliable to warrant probative value, *Daye* requires that it first be shown, preferably on a voir dire, that certain conditions have been met. Because of the hearsay nature of the statement, there must be opportunity for effective cross-examination of the declarant at trial. Additionally, it must be shown that the hearsay statement was that of the declarant and not the prosecutor. Finally, the proponent of the hearsay cannot rely solely on its probative use to meet any burden of proof. See *Commonwealth* v. *Daye*, 393 Mass. at 73-75. Although in the present case defense counsel did not seek a voir dire before attempting to use the prior inconsistent statements, the record before us establishes that the statements are inconsistent, that they are those of Sennott and not the prosecutor, and that they were voluntarily made. See *Commonwealth* v. *Fort*, *ante* 181, 184-185 (1992). The defendant had no burden of proof at trial.

Because Sennott stated that he drew the diagrams based upon his observations and the statements of witnesses, the

Commonwealth argues that the sketches contain second-level hearsay and cannot be used for their probative value. See *Commonwealth* v. *Daye*, 393 Mass. at 73 n.18 ("If it is clear from the context in which the statement was made that the statement was based on hearsay, rather than personal knowledge, the statement may not be admitted as probative evidence"). If the diagrams were based upon the statements of witnesses, that hearsay is found in and limited to the depiction of the placement of the various vehicles. The grand jury transcript shows that Sennott stated that he saw the tire marks in issue on the road. The defendant sought the probative use of the tire marks which Sennott stated, under oath, that he saw.

We conclude that at least one of the diagrams was admissible for its probative value.[7] That diagram, when taken with the testimony of the defendant's experts, supports the defendant's contention that the pickup truck swerved to the right towards him and that he was in the right westbound lane when he began the yaw maneuver in dispute. Based upon the evidence which we have detailed, we cannot say that the erroneous exclusion of the diagrams for all purposes was harmless.

3. *Dismissal of all the indictments.* Although we have concluded that three of the defendant's convictions must be reversed, it remains to be considered whether there will be further proceedings on those charges or whether, as he claims, all the indictments must be dismissed. He argues that the integrity of the proceedings was impaired when Sennott misled the grand jury by relating statements from witnesses that favored the Commonwealth's position while withholding statements of other witnesses that supported the defendant's version of events.

---

[7]We are unable to determine from the record before us whether Sennott used all three or only one of his sketches before the grand jury. But even if, at retrial, it is found that only one of the diagrams is entitled to probative consideration, the other two would nonetheless be available for impeachment purposes.

Certain witnesses to the accident told Sennott in the course of his investigation that the "pickup truck appear[ed] to deliberately cut off the white car and prevent[ ] the white car from passing," that the vehicles were "throwing fakes at each other," and that they were having a "dogfight . . . with both drivers attempting to force one another off the road." The defendant claims that these statements were intentionally withheld by Sennott for the purpose of obtaining indictments on an offense greater than motor vehicle homicide, that is, manslaughter. The fact that he was acquitted on the manslaughter charges, his argument continues, does not cure the prejudice. He claims that had the grand jury heard the omitted statements, he probably would have been indicted for, and had to defend against, no more than the lesser offense of motor vehicle homicide. If that had been the case, his trial strategy would have been very different.

We do not think it is probable that the defendant would not have been indicted for manslaughter had the grand jury been presented with the omitted statements. Indeed, some might view the omitted statements as supporting the Commonwealth's theory. But even accepting the claim that the statements favored the defendant, we see no obligation on the part of the Commonwealth to have presented them to the grand jury. The undisclosed statements were simply, and at best, the conflicting view of different witnesses. There was no misrepresentation or distortion of any particular statement, such as in *Commonwealth* v. *O'Dell*, 392 Mass. 445, 449 (1984).

Nor do we think that the undisclosed statements, which do no more than reflect a point of view of other witnesses, need to be analyzed to determine whether they constitute "evidence which would greatly undermine the credibility of evidence likely to affect the grand jury's decision to indict. . . ." *Commonwealth* v. *McGahee*, 393 Mass. 743, 746 (1985), citing *Commonwealth* v. *Connor*, 392 Mass. 838, 854 (1984). The evidence presented by the Commonwealth in the instant case in no way impaired the function of the grand jury, which is to determine whether there is sufficient

cause to require an accused to proceed to trial. Resolution of conflicting testimony from the witnesses is a matter more appropriately left to the petit jury. See *Commonwealth* v. *Petras*, 26 Mass. App. Ct. 483, 489 (1988).

Even were we to conclude that the Commonwealth should have included the statements in its presentment to the grand jury, we would not order the dismissal of any of the indictments. "Absent egregious misconduct or at least a serious threat of prejudice, the remedy of dismissal infringes too severely on the public interest in bringing guilty persons to justice. Cf. *Pisa* v. *Commonwealth*, 378 Mass. 724, 729-731 (1979); *Commonwealth* v. *Sires*, 370 Mass. 541, 545-546 (1976)." *Commonwealth* v. *Cinelli*, 389 Mass. 197, 210 (1983).

4. *Other claims of error.* By leave of court, the defendant was allowed to file, pro se, a brief supplementing that submitted by his counsel. In that brief, he challenges the jury instructions in three respects. We say no more than that these claims do not warrant discussion.

5. *Conclusion.* With respect to the indictments charging motor vehicle homicide while operating under the influence of liquor and operating under the influence of liquor causing serious injury, the judgments are reversed, the verdicts are set aside, and those matters are remanded to the Superior Court for a new trial. The judgments on the remaining indictments are affirmed.

*So ordered.*