## COMMONWEALTH *vs.* SEBASTIAN R. PINA, JR.

Barnstable. May 4, 1999. - July 14, 1999.

Present: WILKINS, C.J., LYNCH, GREANEY, MARSHALL, & IRELAND, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Evidence,* Admissions and confessions, Hearsay, Impeachment of credibility, Prior inconsistent statement, Relevancy and materiality. *Practice, Criminal,* Admissions and confessions, Voluntariness of statement, Waiver, Voir dire, Examination of jurors, Instructions to jury, Presumption of innocence, Capital case. *Intoxication. Jury and Jurors. Homicide.*

At a hearing on a criminal defendant's motion to suppress a statement that he gave to police officers, the judge correctly concluded that suppression based on the lack of an electronic recording of the statement or any written memorial signed by the defendant was not required. [68-70]

A judge's denial of a criminal defendant's motion to suppress his statements to police on the ground of involuntariness was not clearly erroneous. [70-72]

A criminal defendant, a Cape Verdean, did not meet his burden of demonstrating that he and the white Portuguese victim were of different races for purposes of questioning the jurors individually or that the judge abused his discretion in questioning the venire as a group regarding possible bias against Cape Verdeans. [72-74]

At a criminal trial, the hearsay statement of a nontestifying declarant was properly admitted in evidence for its truth as a statement against penal interest and thereafter, under Proposed Mass.R.Evid. 806, applicable in the circumstances [74-77], a subsequent inconsistent hearsay statement of the nontestifying declarant was admissible to impeach the declarant's credibility. [75-76]

At a murder trial, the judge properly ruled that certain evidence of domestic abuse and injuries on the victim's body, offered to suggest that another person had committed the crime, was inadmissible as too remote and not relevant. [77-78]

Where, at a murder trial, the judge twice during jury selection and again in his final charge instructed the jury on the presumption of innocence and the Commonwealth's burden of proof, there was no error in his declining to instruct on those issues immediately after the clerk had read the indictments to the jury. [78]

At a criminal trial, the judge was not required to instruct the jury that they could consider the absence of a signed written statement by the defendant as a factor in their determination of the voluntariness of the defendant's verbal statement testified to by the police. [78-79]

Evidence at a murder trial was sufficient to warrant a finding beyond a reasonable doubt that the defendant was the person who stabbed the victim and that the killing was accomplished with extreme atrocity or cruelty. [79-80]

INDICTMENT found and returned in the Superior Court Department on May 9, 1995.

A pretrial motion to suppress evidence was heard by *Gerald F. O'Neill, Jr.*, J., and the case was tried before him.

*Russell J. Redgate* for the defendant.

*Julia K. Holler*, Assistant District Attorney, for the Commonwealth.

MARSHALL, J. The defendant, Sebastian R. Pina, Jr., appeals from his conviction of murder in the first degree on a theory of extreme atrocity or cruelty.[1] G. L. c. 265, § 1. He challenges the denial of his motion to suppress a statement he made to the police following his arrest. He also challenges the trial judge's refusal to conduct an individual voir dire of prospective jurors concerning their possible prejudice against Cape Verdeans, various evidentiary rulings, certain jury instructions, and the sufficiency of the evidence to establish that he killed the victim and that he did so with extreme atrocity or cruelty. He seeks either a new trial or a reduction in the verdict, pursuant to G. L. c. 278, § 33E.[2] We affirm the conviction and decline to exercise our statutory power.

1. *Facts*. We recite the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. Responding to an emergency call at approximately 4:20 P.M. on January 30, 1995, police and rescue personnel went to the apartment of the victim, Deborah McGinnis, in Hyannis. She had suffered multiple stab wounds and was unconscious. Shortly afterward she was pronounced dead at a nearby hospital. When the police first arrived at the victim's apartment, her boy friend, Milton Green, was present.

---

[1] The jury were instructed on murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty. A conviction of assault and battery by means of a dangerous weapon was recorded and filed with the defendant's consent. G. L. c. 265, § 15A. See *Commonwealth* v. *Ford*, 424 Mass. 709, 713 n.2 (1997), and cases cited.

[2] The defendant's main brief on appeal was filed by his trial counsel, who has since been appointed a judge of the Superior Court. A short supplemental brief and a reply brief were filed by substitute counsel.

He was intoxicated and had dried blood on his hands. The apartment was in disarray and appeared to have been the scene of a struggle.[3] Because of his intoxicated state, Green was taken into protective custody.

At approximately 4:15 P.M. the same afternoon, the defendant arrived at the home of a friend, Agnes Walker Stefanski, and told her that he had just stabbed the victim six times.[4] At 7 P.M. that evening, Officer Mark Delaney interviewed Stefanski. A warrant for the defendant's arrest issued and at 8:30 P.M. that evening the police located the defendant asleep in his car. They arrested him and took him to the police station, where three police officers interviewed him. After initially denying that he had been at the victim's apartment, the defendant confessed to having stabbed the victim. Pursuant to a search warrant, the police took the defendant's clothes, samples of his hair, skin swabs, and nail clippings. No physical evidence linked the defendant to the crime. The police found no incriminating evidence in his automobile.

2. *Motion to suppress.* According to the testimony of the three police officers who interrogated the defendant following his arrest, the defendant gave three versions of the day's events during the approximately one and one-half hour interrogation. He first denied being with Green or the victim that day. When told that the police knew that he had been at the victim's apartment, he described a visit there, but said nothing of the stabbing. He said that he had spent several hours at the apartment, that all three had been drinking, and that Green and the victim had a heated argument. The police then confronted the defendant with Stefanski's statement, at which time he confessed to having stabbed the victim "[f]our to six times." The defendant later identified the murder weapon from an array of three knives taken from the victim's apartment. One interrogating officer testified that the following morning, the defendant told him that

[3]The defendant introduced evidence tending to establish that on prior occasions Green had physically assaulted the victim.

[4]Stefanski was a friend of both Green and the defendant. She testified that the defendant arrived at her home, sat for a few minutes, and then told her that he had stabbed the victim. She telephoned the victim's home and had a conversation with Green. The defendant left her home approximately five minutes later. Later she spoke with another friend, who in turn telephoned the police.

"he felt better that he had told the truth. He was able to sleep."[5]

The defendant challenges the admission of his statement on several grounds. The police did not electronically record their interrogation of him. The defendant neither wrote out his statement nor signed a copy prepared for him, nor did he otherwise acknowledge making the statement. The police did not administer any sobriety testing despite, he claims, having reason to believe he was heavily intoxicated. The officer who took notes during the interrogation later destroyed his notes. For these reasons, separately and collectively, the defendant claims the Commonwealth failed to establish the reliability of the statement or, if made, whether the statement was voluntary. We have declined to date to require that the police electronically record a suspect's statement. See *Commonwealth* v. *Ardon*, 428 Mass. 496, 498 (1998), citing *Commonwealth* v. *Diaz*, 422 Mass. 269, 273 (1996).

The defendant argues that his case presents compelling reasons for revisiting that question and for concluding that in the unique circumstances here, his "purported" statement must be suppressed. It was, he claims, the word of the police officers against his own whether he even made the statement attributed to him. In *Commonwealth* v. *Diaz*, *supra*, there was no electronic recording of the defendant's custodial interrogation but, we noted, *id.* at 270, the defendant gave a signed statement to the police, which was read to the jury and admitted in evidence. Here, in contrast, the defendant's statement was not reduced to writing, by himself or by the police, for him to sign. The defendant points to other circumstances that make his case different. One of the three interrogating police officers testified that he took notes during the interrogation and that he destroyed his notes following the preparation of the police report.[6] In addition, says the defendant, the only facts that he purportedly told the police were first told to him by the police during the

---

[5]Defense counsel established that at the earlier trial of the defendant, which resulted in a mistrial due to a hung jury, the officer had not testified that the defendant told him that he felt better because he "told the truth," but had testified that the defendant merely told him that he was "fine" and had "slept well."

[6]Only Detective James Tamash took notes during the interview of the defendant. He and the other two interrogating officers met several days later, pooled their recollections, and prepared a joint description of what had transpired. One officer testified that, when the report was prepared, they could not agree on the order of events during the interrogation. Officer Tamash

course of his interrogation.[7]

The judge correctly concluded that he was not required to suppress the statement because there was neither an electronic recording nor a written memorial signed by the defendant. See *Commonwealth* v. *Rankins*, 429 Mass. 470, 472 n.2 (1999).[8] The three police officers who interrogated the defendant each testified at the hearing on the motion to suppress and at trial.[9] There is no suggestion by the defendant that Detective Tamash destroyed his notes because they were inconsistent with the formal police report or with the testimony of the other police officers. Nor does the defendant contend that he never made a statement to the police.[10] The fact that notes were destroyed may be commented on by a defendant, as may the failure to record statements to the police. The defendant did so, forcefully, first to the judge and later to the jury. It was up to the judge to determine, based on all of the evidence, whether the testimony of the officers describing the defendant's statement was credible. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). We give substantial deference to a judge's findings and conclusions of law, "but independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Nieves*, 429 Mass. 763, 768-769 n.5 (1999), quoting *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996). The judge's decision to deny the motion to suppress on these grounds was not clearly erroneous. *Id.*

The defendant separately claims that the Commonwealth did

destroyed his notes sometime thereafter.

[7]Before the defendant was arrested, an officer had interviewed Agnes Stefanski and, apparently, had taken detailed notes during that interview. During the interrogation of the defendant, the officer confronted him with her statement, reading from his notes "line by line." At some later time, the officer inexplicably destroyed his notes of his interview with Stefanski.

[8]For the reasons we described in *Commonwealth* v. *Ardon*, 428 Mass. 496, 498-499 (1998), we again "decline to go beyond our prior pronouncements" and shall not exclude as a matter of law a defendant's statement to interrogating police officers because it was not recorded. For much the same reasons, we decline to require that evidence of a defendant's statement to the police be excluded unless the statement is reduced to writing and signed by him.

[9]Officer Delaney was called by the Commonwealth at the first trial. At the second trial, he did not testify on behalf of the Commonwealth, but was called as a witness by the defendant. At the second trial defense counsel elicited testimony that could have been viewed by the jury as inconsistent with his testimony at the first trial.

[10]The defendant does argue that he was so intoxicated at the time of his arrest that whatever he said was unreliable, see discussion, *infra*, and that he

not meet its burden of proving beyond a reasonable doubt that his waivers of his Miranda rights were voluntary and that his statements to the police were voluntary. The defendant was given the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966), on four separate occasions: immediately on his arrest, as he was being transported to the police station, when he was booked at the station, and before his interrogation commenced. He was, he says, so inebriated at the time that his multiple waivers, as well as his statements, could not have been voluntary. He points out that the police officers knew he had a reputation for abusing alcohol, and that the odor of alcohol noticed by some witnesses, his bloodshot eyes, his shaking hands, and his report to the police of having earlier purchased a large quantity of alcohol required the police to test his sobriety before questioning him.

"While police officers should be sensitive to a defendant's state of intoxication, *Commonwealth* v. *Hosey*, 368 Mass. 571, 577 (1975), they are ordinarily 'entitled to rely on a suspect's outward behavior and assurances of sobriety' when deciding whether to proceed with an interrogation. *Commonwealth* v. *Parham*, 390 Mass. 833, 839 (1984)." *Commonwealth* v. *Lanoue*, 392 Mass. 583, 589 (1984). There was no testimony that the defendant gave the officers any "assurances of sobriety," *id.*, but all three officers testified that, despite recognizing indications that the defendant had consumed alcohol, they believed, based on his outward conduct, his responses to their questions, and their prior experiences with him, that he was not intoxicated. Each had an opportunity to observe him over several hours, including as he walked without assistance about the station house.

The defendant's sobriety may bear on the determination of the voluntariness of his waivers and of his statements, and the weight that should be afforded them, as may the absence of an electronic recording. See *Commonwealth* v. *Diaz, supra* at 273. The defendant argued these points to the motion judge and later to the jury. *Id.* He also had, and made use of, the opportunity to cross-examine the officers who testified concerning the contents of his statement. The motion judge noted the absence of a recording in his findings regarding the voluntariness of the statement.[11] The judge's decision to deny the motion to suppress was not clearly erroneous. See *Commonwealth* v. *Nieves, supra* at 768-769 n.5;

---

was merely parroting facts provided to him by the police.

[11]Ruling on the motion to suppress, the judge found:

*Commonwealth* v. *Yesilciman, supra* at 743. The defendant's rights were "adequately protected" by the rule requiring the Commonwealth to prove beyond a reasonable doubt that the defendant's waiver of his rights and his statement to the police were voluntary. *Commonwealth* v. *Ardon, supra* at 500.

3. *Individual voir dire.* The victim was white, of Portuguese descent; the defendant is Cape Verdean. Prior to jury selection, the defendant requested that each prospective juror be asked individually whether he or she harbored any bias against Cape Verdeans.[12] Explaining his request to the judge, defense counsel focused on the defendant's "ethnicity," the "distinct cultural heritage" of Cape Verdeans, and "an ethnic recognition that is cultural, is social." He told the judge, "[I]f you ask [the defendant], 'What is your ethnicity, sir,' he would respond to that he's Cape Verdean. He would not identify himself as black. But in the eyes of many other people in our community, *one* is

---

"The Barnstable and State Police had available to them videotape equipment, tape recorders and pencil and paper. Despite the availability of these electronic aids and other paraphernalia, no attempt was made to memorialize the defendant's statements. Detective Tamash's notes relative to the interrogation were destroyed after their content was incorporated into the formal police report. In addition, even though the defendant was known to the police as a drinker, had an odor of alcohol according to some witnesses, bloodshot eyes according to others and had been in possession of beer and vodka there was no attempt to ascertain his sobriety by a field sobriety test, breathalyser, or blood sample. On the present state of the law, there is no basis for the suppression of the defendant's statements either for failure to memorialize those statements or for failure to conduct sobriety tests. These facts, once established, may present a valid basis for argument to the jury relative to the weight to be given to the defendant's alleged confession. . . ."

The defendant claims that the motion judge failed to consider the absence of a recording and of sobriety testing as factors in his determination that the Commonwealth had proved a valid waiver of rights and the voluntariness of his statements. The judge's memorandum of decision does not bear this out. Rather, the judge declined to accept the defendant's argument that a recording, statement signed by the defendant, and a sobriety test are each required as a matter of law.

[12]The defendant requested that the judge ask the following questions of each juror: "[The defendant] is Cape Verdean. The woman who died is White. Would the fact that [the defendant] is Cape Verdean in any way interfere with your ability to render an impartial verdict?" and, "Do you have any prejudice or [bias] when it comes to people of Cape Verdean descent?"

black if *they* are Cape Verdean" (emphasis added). The judge declined to question the prospective jurors individually, but offered to question them as a group on this subject.[13] The defendant's counsel declined.

Relying here for the first time on encyclopedic definitions of "Cape Verdean,"[14] the defendant claims that his "racial distinction" as a Cape Verdean "triggers the individual voir dire." See *Commonwealth* v. *Hunter*, 427 Mass. 651, 654 n.5 (1998) (when requested by defendant accused of murder, judge must make individual inquiry where defendant and victim are members of different racial groups). See also *Commonwealth* v. *Young*, 401 Mass. 390, 398 (1987) (same). His claim fails for two reasons. He did not meet his burden of demonstrating that he and the victim were of different races as we have used that term for these purposes, and he has not established that the judge abused his discretion in declining to question the jurors individually regarding any bias against Cape Verdeans.

The recognition of pervasive racial bias in our society has led us to conclude that in murder trials involving a defendant and a victim of different races,[15] there is a "reasonable possibility" that prejudice would influence the jury, regardless of the particulars of a given case. See *Rosales-Lopez* v. *United States*, 451 U.S. 182, 190 (1981) (plurality opinion), cited in *Commonwealth* v. *Young, supra* at 398. Individuals may in some circumstances encounter discrimination because of their national

[13]In offering to question the jury as a panel, the judge explained that the questions would "draw[] attention to something that would never occur to 99 percent of the people here in Barnstable County who come in for jury service," and that if the questions were not asked, "it would never occur to [the jurors] that your client was any different than any other citizen on Cape Cod. . . . The Court strongly suggests that the fact that [the defendant] is a Cape Verdean should not even be mentioned. However, the Defendant has a right to ask the Court to ask these questions, and I will."

[14]The defendant relies on 29 Encyclopedia Britannica 834 (15th ed. 1993), which states that two-thirds of the population of Cape Verde is of mixed European and African descent, and the "remainder" is of either European or African descent, and on 5 Encyclopedia Americana 590 (Int'l ed. 1994) for the same proposition. These were not part of his proffer to the trial judge.

[15]In *Commonwealth* v. *De La Cruz*, 405 Mass. 269, 272 (1989), we explained that the term "race" reflects the historical division of humanity by physical characteristics into three primary divisions: Caucasian, Mongolian, & Negro. We use for these purposes a biological, rather than cultural, definition of race. See Webster's II, at 968 (1984) (race defined as a "population that differs from others of the same species in the frequency of hereditary traits").

origin or ethnicity. That does not mean that in every criminal case there is a "reasonable possibility" that prejudice or bias against the individual's group would influence a jury. The judge was not required to conduct an individual voir dire. See, e.g., *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 549 n.10 (1990), citing *Commonwealth* v. *De La Cruz*, 405 Mass. 269, 274 (1989) (term "Hispanic" raised issue of ethnic rather than racial bias); *Commonwealth* v. *Bodden*, 24 Mass. App. Ct. 135, 140 (1987) (where defense counsel informed judge that defendant was black and complainant was Puerto Rican, individual voir dire not required because "the defendant must make a showing to the judge that he and the complainant are of different races").

It is in the sound discretion of trial judges to determine on a case-by-case basis whether an individual voir dire is required. See *Commonwealth* v. *Hunter, supra* at 654; *Commonwealth* v. *De La Cruz, supra* at 272. See also G. L. c. 234, § 28. We shall reverse a judge's failure to question jurors individually upon request only "when a 'substantial risk' of bias has been shown." *Commonwealth* v. *Hunter, supra*, quoting *Commonwealth* v. *De La Cruz, supra* at 274. That some members of the Cape Cod community might, in the abstract, consider Cape Verdeans "black" does not, without more, suggest any such substantial risk. See *Hunter, supra* at 654 (fact that some members of the venire described victim, native of the Philippines, as "Asian" did not entitle white defendant to individual voir dire on racial prejudice). The Commonwealth did not argue that the defendant's status as a Cape Verdean was relevant in any respect to this murder. No ethnic (or indeed racial) factors were suggested as a possible motive for the killing, or otherwise informed the evidence. The defendant was a friend of the victim. He was not identified as a suspect because he is Cape Verdean. We are satisfied that the judge, cognizant of the risk of focusing the attention of the jury on the defendant's national origin, *Commonwealth* v. *Lumley*, 367 Mass. 213, 216-217 (1975), considered the issue and determined that no substantial risk of bias arose due to any difference between the defendant and the victim. There was no error.

4. *The impeachment of a hearsay declarant with a prior inconsistent hearsay statement.* The defendant's strategy at trial was to suggest to the jury that Milton Green, the victim's boy friend who was present at the scene of the crime when the

police arrived, killed the victim. The Commonwealth sought to call Green as a witness; he exercised his right under the Fifth Amendment to the United States Constitution not to testify. A defense witness distantly related to Green, Joan Pires, testified that during the latter part of 1996, Green told her that he had killed the victim.[16] In rebuttal, the prosecutor called Sergeant Joellen Jason. She testified that on arriving at the crime scene she asked Green what had happened. According to her, Green responded: "Junior did this."[17] Jason was the last witness to testify before closing arguments. The defendant challenges the admission, over his objection, of the statement Green made to Jason.

Green's hearsay statement to Pires was properly admitted for its truth under the exception for statements against penal interest. See *Commonwealth* v. *Drew*, 397 Mass. 65, 73-76 (1986). Although Pires was the witness before the jury, her testimony "effectively allowed the [defendant], through the testimony of [Pires], to place [Green] on the stand to testify." *Commonwealth* v. *Sellon*, 380 Mass. 220, 224 n.6 (1980). Green's statement to Jason, as testified to by Jason, was admitted to impeach Green's statement to Pires; it was not offered for the truth that "Junior" (the defendant) had killed the victim. See *Commonwealth* v. *Donnelly*, 33 Mass. App. Ct. 189, 197 (1992) ("[w]hen used for impeachment purposes, prior inconsistent statements are not offered for the truth of the matter therein asserted . . .").

Under Rule 806 of the Proposed Massachusetts Rules of Evidence, identical to Rule 806 of the Federal Rules of Evidence, the credibility of the declarant of a hearsay statement may be impeached by any evidence that would have been admissible if the declarant had testified, even if the declarant has no opportunity to deny or explain any inconsistent statement or behavior.[18] We previously have cited the rule with approval.

---

[16]Pires testified that Green "said that there was something he wanted to speak to me about . . . that [the defendant] wasn't the one who murdered [the victim]. He had came [*sic*] forward and told me that he was the one, and he didn't know how to come about coming to court to tell the court that it was him."

[17]"Junior" was the defendant's nickname. Jason testified that when she arrived at the crime scene, Green was standing at the door. She asked him what had happened, and he responded, "My lady's dead or almost dead." She asked again what had happened. He then said, "Junior did this."

[18]Rule 806 of the Proposed Massachusetts Rules of Evidence, identical to Rule 806 of the Federal Rules of Evidence, states in relevant part:

*Commonwealth* v. *Sellon, supra.* See *Commonwealth* v. *Vermette*, 43 Mass. App. Ct. 789, 800-801 (1997) (citing Proposed Mass. R. Evid. 806 for proposition that prior inconsistent hearsay statements may be introduced to impeach declarant of hearsay statement reported in testimony of witness). We now adopt the rule in the circumstances of this case.

Green's statement to Jason would have been admissible for impeachment purposes had Green himself testified. "It is a well-settled rule of evidence that if a witness makes a statement relevant to an issue on trial, the adverse party has the right to 'show that the witness has made previous inconsistent or conflicting statements . . . by proving them by other witnesses.' " *Commonwealth* v. *Simmonds*, 386 Mass. 234, 242 (1982), quoting *Commonwealth* v. *West*, 312 Mass. 438, 440 (1942), and cases cited. Testimony reporting a hearsay statement "tend[ing] to contradict [the declarant's] testimony . . . [is] admissible." *Commonwealth* v. *Cataldo*, 326 Mass. 373, 377 (1950). See *Commonwealth* v. *Simmonds, supra.*[19]

The defendant also attacks the admission of Jason's testimony because of the unreliable nature of the impeaching statement as one "in which the speaker pushes blame away from himself and thrusts it on another." *Commonwealth* v. *White*, 370 Mass.

---

"When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked . . . by any evidence which would be admissible for [that] purpose[] if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with his hearsay statement, is not subject to any requirement that he may have been afforded an opportunity to deny or explain."

[19]Green's statement to Jason plainly contradicts Green's statement to Pires. Because the contradicting statement went to the main issue — whether the defendant or Green killed the victim — it is arguable that the trial judge had no discretion to preclude its use for impeachment purposes. See *Commonwealth* v. *A Juvenile*, 361 Mass. 214, 218 (1972) ("extent of cross-examination on collateral issues must be left largely to the discretion of the trial judge, but that rule has no application where alleged contradictory statements of a witness relate to the main issue that is being tried"); *Commonwealth* v. *West*, 312 Mass. 438, 440 (1942); *Commonwealth* v. *Donnelly*, 33 Mass. App. Ct. 189, 197 (1992). In each of those cases, the witness whose testimony the Commonwealth sought to impeach was on the witness stand. A trial judge shall have the discretion to decline to admit previously inconsistent or conflicting statements to impeach a declarant, where the "declarant" is not testifying before the judge or jury.

703, 713 (1976). That, however, is a matter going to the weight of the evidence, not its admissibility. The judge gave a limiting instruction to the jury. There was no error in the admission, for purposes of impeachment, of Green's statement to Jason.

5. *The exclusion of evidence of domestic abuse of the victim by Green.* As we explained earlier, the defense strategy was to persuade the jury that Green, and not the defendant, murdered the victim. The judge excluded certain evidence that the defendant claimed would establish that Green previously had been violent toward the victim, and had threatened to kill her. The judge excluded evidence of two such incidents because they were separated in both time and nature from the murder of the victim.[20] He admitted in evidence testimony regarding a third incident.[21] The judge also excluded certain questions regarding the pathologist's examination of the victim's body to investigate possible domestic abuse, but did allow questioning regarding the presence of numerous bruises on the victim's body and their likely greater age than her mortal wounds. Our inquiry is whether these challenged rulings were erroneous, and, if so, whether any error was prejudicial to the defendant. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998). There was no error.

The trial tactic of introducing evidence to suggest that someone else committed the crimes charged "is, like any other, limited by the fundamental principle that evidence must be relevant." *Commonwealth* v. *Rosa*, 422 Mass. 18, 22 (1996). The defendant's evidence "must have a rational tendency to prove the issue the defense raises, and the evidence cannot be

---

[20] In a 1992 incident, the victim told a police officer that Green had threatened to "put her [six feet] under." The judge excluded that evidence because it was too remote in time to be relevant evidence of Green's mental state at the time of the murder in 1995. The defendant counters that the statement "was highly relevant for it showed a long held motive on the part of Green" to kill the victim.

In an April, 1994, incident, the police took Green to a hospital in a confused mental state at the request of mental health authorities. He asked a police officer how many people had been killed in his apartment, and whether he, Green, had a gun. There was no evidence to suggest that the victim was involved in this incident in any way.

[21] The evidence concerned an October, 1994, police visit to the apartment the victim and Green shared. The two were engaged in a domestic altercation that led to an assault charge against Green, pending at the time of the victim's death. The defendant claims the pending charge was evidence of a motive for Green to kill the victim.

too remote or speculative." *Id.* We accord a trial judge "substantial discretion in deciding whether evidence is relevant, and whether the prejudicial implications of such evidence outweigh its probative value." *Commonwealth* v. *Tobin,* 392 Mass. 604, 613 (1984). In the case of each exclusion, the judge correctly evaluated the proffered testimony on these grounds. Having examined the record, we are satisfied that the judge's rulings were well within his discretion, *id.,* and not erroneous.

6. *Jury instructions.* (a) After the clerk had read the indictments to the jury, the defendant requested a preliminary instruction to the effect that an indictment was merely the vehicle by which the defendant was brought into court, that it was not evidence against him, and that the defendant was presumed innocent until proved guilty. The judge declined to give these instructions at that time, but did so in his final charge. The defendant claims that this failure nullified the presumption of innocence. There was no error.

The judge, during the jury selection phase, twice instructed the venire that the defendant was presumed innocent and that the Commonwealth had the burden of proving each of the crimes charged beyond a reasonable doubt. In his final instructions before the jury deliberated, the judge again emphasized the presumption of innocence and the Commonwealth's burden of proof.

In *Commonwealth* v. *Boyd,* 367 Mass. 169, 188 (1975), we said that the "function [of an instruction regarding the presumption of innocence] is to emphasize to the jury that 'the finding of an indictment by the grand jury . . . [is] not to be regarded as . . . [a circumstance] tending to criminate the defendant or creating against him unfavorable impressions, and that he is not to be found guilty upon suspicion or conjecture but only upon evidence produced in court.' *Commonwealth* v. *DeFrancesco,* 248 Mass. 9, 13 (1924)." The charge more than adequately informed the jury of the presumption of the defendant's innocence.

(b) In the portion of the judge's charge concerning the jury's determination of the voluntariness of the defendant's waiver and statement to the police, the judge instructed that the jury could consider the absence of an electronic recording as a factor in their decision. The defendant requested a similar instruction,

which the judge did not give, regarding the absence of a signed written statement by the defendant.[22] In *Commonwealth* v. *Diaz, supra* at 273, we said that a defendant is entitled to argue to the jury that the absence of an electronic recording of his statement should be considered as a factor affecting the voluntariness of that statement. We have not required that the judge give a corresponding instruction. The judge nevertheless acceded to the defendant's request to instruct the jury regarding the absence of an electronic recording. That instruction was more than is required. The jury instructions were a model of clarity. That the judge declined to give an instruction concerning the failure of the police to obtain a written statement or signature from the defendant was not error.

7. *Sufficiency of the evidence.* The defendant moved for a required finding of not guilty at the close of the Commonwealth's case, which the judge denied. He argues that the evidence was insufficient to prove (a) that he was the person who stabbed the victim, and (b) that the killing was accomplished with extreme atrocity or cruelty.

The defendant's statement to Agnes Stefanski and his subsequent confessions to police, if believed, provided sufficient evidence to warrant a finding beyond a reasonable doubt that he was the person who stabbed the victim. The defendant argues that "there was nothing extreme, atrocious, or cruel about this homicide in comparison to others," that there was "no evidence from which the jury could derive a standard of cruelty or atrocity which could fairly be termed 'ordinary,' " and that therefore the Commonwealth did not meet its burden of proving that the victim was murdered with extreme atrocity or cruelty.[23] See *Commonwealth* v. *Semedo*, 422 Mass. 716, 721 (1996), quoting

[22]The requested instruction stated:

> "You have heard evidence that the statement which the defendant allegedly made was not reduced to written form by the defendant or by one of the officers and then signed by the defendant. The failure of the police to secure such a written statement from a defendant should be considered by you in deciding the voluntariness of that statement and whether any statement attributed to the defendant was in fact made."

[23]The defendant suggests that such proof "would involve statistical evidence comparing a large and fair sample of unlawful killings, perhaps all the killings in some jurisdiction over a number of years. Various charts might assist in comparing the various factors, i.e., number of blows, instrumentalities

*Commonwealth* v. *Connolly*, 356 Mass. 612, 628, cert. denied, 400 U.S. 843 (1970) (evidence must be of such character as to show that crime committed in circumstances indicating something more than "ordinary atrocity or cruelty"). The jury were properly instructed on the factors we described in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). There was evidence of multiple stab wounds, several of which were life threatening. The victim was conscious for at least some time during and after the stabbing, and suffered internal bleeding and a gradual loss of blood until she died. The evidence was sufficient to support the jury's determination. See *Commonwealth* v. *Carrion*, 407 Mass. 263, 278 (1990).

8. Pursuant to our duties under G. L. c. 278, § 33E, we have reviewed the entire record. In seeking relief under that statute, the defendant asks us to consider the evidence that he (and Green and the victim) had consumed substantial amounts of alcohol on the day of the killing. He characterizes the death of the victim as the "tragedy of a minor controversy exploding into the killing of a human being." See *Commonwealth* v. *Keough*, 385 Mass. 314, 320 (1982). He observes that he and the victim had no previous hostility between them and that the "entire incident was characterized by senseless conduct by all present." These are matters that were considered by the jury, who received the evidence under appropriate legal rulings free of error. "Regard for the public interest impels us to use with restraint our power under § 33E to modify the jury's verdict." *Commonwealth* v. *Garabedian*, 399 Mass. 304, 316 (1987), quoting *Commonwealth* v. *Williams*, 364 Mass. 145, 151 (1973). We find nothing that would compel us to exercise our discretion to disturb the jury's verdict, either to reduce the verdict or to grant a new trial.

*Judgment affirmed.*

---

employed, duration of conscious suffering (intensity too if it could be measured or even estimated with any assurance), etc."