## Commonwealth *vs.* Leyton Burgos.

Hampden. December 9, 2011. - April 17, 2012.

Present: Ireland, C.J., Botsford, Gants, & Lenk, JJ.

*Homicide. Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Capital case, New trial, Assistance of counsel, Conduct of prosecutor, Voluntariness of statement, Instructions to jury, Argument by prosecutor, Cross-examination by prosecutor, Discovery. *Evidence,* Exculpatory, Impeachment of credibility, Disclosure of evidence, Voluntariness of statement, Cross-examination. *Witness,* Impeachment, Credibility. *Due Process of Law,* Disclosure of evidence.

A Superior Court judge did not abuse his discretion in denying the criminal defendant's motion for a new trial on an indictment charging accessory before the fact to murder in the first degree, where the record supported the judge's conclusion that no prosecutorial error or violation of the defendant's due process rights arose with regard to the admission in evidence of the testimony of two witnesses who testified pursuant to cooperation agreements; further, no error occurred in the admission of the witnesses' testimony, and trial counsel was not ineffective in failing to challenge the admissibility of the witnesses' testimony, where the record supported the judge's view that one witness had not agreed, as a condition of receiving prosecutorial "consideration" in his own case, to testify to the contents of his third statement to police regardless of whether it was true, and where, although there was some support in the record that the other witness had been pressured and threatened by police before giving his initial statement, the police actions fell far short of the type of misconduct that would justify exclusion of that witness's testimony. [59-66]

At the trial of an indictment charging the defendant with being an accessory before the fact to murder in the first degree, the judge did not abuse his discretion in instructing the jury, over objection, on consciousness of guilt, where the jury could infer that the defendant was worried that the seizure of the murder weapon would connect him to the crime, and where his alternate explanation for his trip to Puerto Rico created a jury question; further, no substantial likelihood of a miscarriage of justice arose from the contents of the judge's instruction, despite an error in stating that the defendant fled the Commonwealth after he discovered that he was about to be charged with accessory before the fact to murder, where, immediately after the misstatement, the judge reemphasized the jurors' exclusive role as fact finders and stated that he mentioned the evidence only to illustrate the legal point involved. [66-69]

At the trial of an indictment charging the defendant with being an accessory before the fact to murder in the first degree, counsel was not ineffective in

calling a certain witness to testify, where the decision to call the witness was not manifestly unreasonable when made, despite the witness's not testifying entirely as expected. [69-71]

At the trial of an indictment charging the defendant with being an accessory before the fact to murder in the first degree, the prosecutor's description, in his opening statement and closing argument, of gang life and the world of gangs was at, but not over, the edge of proper argument [71-72]; further, an improper statement by the prosecutor in his closing argument did not prejudice the defendant when viewed in light of the entire argument, the trial testimony, and the judge's instructions to the jury [72].

There was no merit to the criminal defendant's claim of improper cross-examination at trial, or to his claim of abuse of discretion in denying his motion for a new trial without holding an evidentiary hearing. [72-73]

This court, in reviewing the trial of an indictment charging the defendant with being an accessory before the fact to murder in the first degree, concluded that the judge's general instruction regarding the topic of witness credibility did not, in the circumstances of the case, constitute an error requiring reversal of the defendant's conviction, where, although it would have been preferable for the judge to give a fuller and more cautionary instruction to the jury about their consideration of the testimony of two witnesses who had themselves been charged with committing or being an accessory to the murder, the jury were apprised of the cooperation agreements to which the witnesses were parties, and all participants at the trial emphasized that the both witnesses were testifying pursuant to those agreements. [73-75]

INDICTMENT found and returned in the Superior Court Department on January 11, 1996.

The case was tried before *Daniel A. Ford*, J., and a motion for a new trial, filed on April 30, 2008, was heard by him.

*John M. Thompson* (*Linda J. Thompson* with him) for the defendant.

*Dianne M. Dillon*, Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. A Superior Court jury found the defendant, Leyton Burgos, guilty of being an accessory before the fact to the murder in the first degree of Sylvia Ramirez. The defendant appeals from his conviction and from the denial of his motion for a new trial. He argues there were errors relating to the testimony of two key prosecution witnesses; the trial judge's instruction concerning consciousness of guilt was erroneous; and his trial counsel was ineffective in several respects. The defendant raises other claims that we discuss *infra*. For the reasons discussed

below, we affirm the defendant's conviction and the denial of his motion for a new trial. We also decline to exercise our power pursuant to G. L. c. 278, § 33E,[1] to order a new trial or enter a verdict of a lesser degree of guilt.

1. *Background.* a. *Evidence at trial.* We recite the facts as the jury could have found them. In May of 1994, the defendant was a member of Los Solidos, a gang active in the city of Springfield. At that time, Los Solidos was "at war" with rival gangs, including La Familia and the Latin Kings. The conflicts between the gangs arose from disputes over drug territory. The victim, Sylvia Ramirez, was a member of La Familia, serving as that gang's "godmother."[2] The defendant was an "enforcer" for Los Solidos. In this capacity, he was responsible for enforcing various gang rules and ensuring that gang "missions" were completed. On missions, Los Solidos gang members would exact violence against rival gang members as a means of dealing with various disputes.

Members of Los Solidos often congregated and socialized at the apartment of Jessica Nieves, located at the corner of State and Terrence Streets in Springfield. On May 27, 1994, the day before Ramirez was killed, approximately fifteen members of Los Solidos, including the defendant, gathered at Nieves's apartment. Erasmos Santos Vega, a "soldier" in Los Solidos, was also at the apartment that day. (Soldiers held the lowest rank in the strict hierarchy of Los Solidos.) Vega made his living stealing cars; he also stole them for Los Solidos. The defendant told Vega of his desire to be elevated to the position of "chief warlord" by the "president" of Los Solidos, Miguel Moure, and that it would be necessary to "hit five people" to be promoted.

Later that day, Moure made an appearance at Nieves's apartment. After saluting Los Solidos members present, Moure went into the apartment's bathroom with the defendant and discussed the need to "do something." The defendant subsequently sum-

---

[1] A person convicted of accessory before the fact to murder in the first degree is entitled to review pursuant to G. L. c. 278, § 33E. See, e.g., *Commonwealth* v. *Rebello*, 450 Mass. 118, 122 (2007).

[2] The record is devoid of evidence that might shed light on the victim's role as "godmother."

moned Vega to the bathroom, where he informed Vega that he was responsible for procuring a car for an upcoming mission. The defendant and Vega then left the bathroom and went into the adjacent bedroom, where they were joined by Moure. The defendant repeated his wish to "hit five people," and the three then discussed where the mission should take place. The defendant suggested Locust Street in Springfield because it was the home of the La Familia's godmother. After Moure confirmed that Locust Street would be the site of the first hit, the defendant told Vega again that it was his responsibility to procure a car for the mission, and that if he failed to do so he would be subject to a "bounce" — a beating at the hands of Los Solidos enforcers. The defendant thereafter told Nieves that Ramirez, as godmother of La Familia, "had to die."

At some point after the end of the meeting in the bedroom, the defendant and another member of Los Solidos took out two guns — referred to as the "Chrome 9" and the "44" — belonging to Los Solidos that were stored in Nieves's bedroom. The defendant cleaned the "Chrome 9" and some ammunition before reinserting the ammunition in the gun. Later the same night, Vega stole a car from a parking lot in Holyoke, drove the car back to Springfield, and parked it in a prearranged location.

The next day, May 28, three members of Los Solidos — Wilfredo Rosado, Jose Carrasquillo, and Travis DeJesus — met on High Street in Springfield, outside of DeJesus's apartment. DeJesus held the position of a "warlord" in Los Solidos; Rosado and Carrasquillo were both soldiers. Among DeJesus's responsibilities was distributing weapons for Los Solidos missions. To that end, DeJesus provided the "Chrome 9" firearm to Carrasquillo. Rosado, Carrasquillo, and DeJesus were then joined by the defendant, who asked DeJesus if Rosado and Carrasquillo knew "what was up." DeJesus confirmed that the two knew "what to do"; Rosado testified at trial that he had understood the goal of the mission was to kill a member of La Familia on Locust Street.

The defendant, Rosado, and Carrasquillo then retrieved the car that Vega had stolen the day before. They departed for the mission, with Rosado driving, Carrasquillo occupying the front passenger seat, and the defendant sitting in one of the rear seats.

As Rosado began to drive down Walnut Street, the defendant, apparently nervous and stuttering, abruptly asked to be let out of the car, stating that he needed to get to "the Getty," a gasoline station near Nieves's apartment where Los Solidos members often congregated. Rosado offered to give the defendant a ride, but the defendant declined and instructed them, "You guys just keep going." Rosado then let the defendant out of the car. The defendant did not tell Rosado and Carrasquillo to abort or otherwise abandon the mission, and Rosado and Carrasquillo continued driving to Locust Street.[3]

Rosado drove down Locust Street a first time, and saw two different groups of people congregated outside: a group containing some children, and another that included some La Familia gang members, identifiable by their gang colors. When Rosado drove down the street a second time, only the group of La Familia members remained outside. Rosado then slowed down as he approached the group of La Familia members, and Carrasquillo pointed the "Chrome 9" out of the window and fired five or six shots. Ramirez, who was sitting on the front steps of 190 Locust Street with several friends, was struck on the right side of her head by a projectile fired from the "Chrome 9"; the projectile may have ricocheted off of a hard surface before striking her. After the shooting Rosado drove the vehicle to Edwards Street in Springfield, where he and Carrasquillo wiped it down and set it on fire. Ramirez died as a result of a brain injury sustained from the gunshot wound.

Three weeks later, on June 20, 1994, two Springfield police officers went to Nieves's State Street apartment to retrieve Fabiola Ocampo, a fifteen year old girl who was classified as a "runaway," and who they suspected was staying in the apartment with Nieves. When the officers arrived, they knocked on the door and identified themselves. At the time there was a group of more than ten people gathered in the apartment. The defendant was present and was holding the "Chrome 9" that had been used by Carrasquillo on May 28. Looking through the door's peephole, the defendant observed the police, quickly

---

[3]Rosado testified at trial that, because the defendant outranked him and Carrasquillo in Los Solidos hierarchy, they were obligated to follow through on the mission unless the defendant called it off.

retreated into the living room, and threw the gun under a couch. Nieves eventually allowed the officers into apartment. While there, the police located Ocampo as well as Frances Gonzalez, another fifteen year old runaway who was at the time the defendant's girl friend. They also found — and seized — three guns, including the "Chrome 9" that was under the couch. After the police left, the defendant said, "Damn, I hope Jerry[4] doesn't buy it. That's the gun that killed Sylvia."

Approximately one week after the police came to Nieves's apartment, Gonzalez went to Puerto Rico, where she stayed with the defendant's mother. In early July, the defendant also departed for Puerto Rico, joining Gonzalez and staying with his mother. Two months after their arrival in Puerto Rico, Gonzalez and the defendant ended their relationship. Gonzalez was picked up by her father and returned to Springfield; the defendant remained in Puerto Rico.

b. *Other facts.*[5] The initial investigation into Ramirez's death focused on Frankie Velazquez and Pedro Cotto, two members of Los Solidos who had been identified to the police by La Familia members. Although Velazquez and Cotto were charged with Ramirez's murder, the charges against them were dropped after the police began to have doubts about the accounts provided by the members of La Familia. Subsequent statements provided by various members and associates of Los Solidos implicated several members, including Moure, Carrasquillo, Vega, and the defendant.

Indictments of these four individuals followed, although not all at the same time. The defendant was initially indicted for conspiracy to commit murder on September 13, 1994. In June of 1995, he was arrested in Puerto Rico on the conspiracy charge and extradited to Massachusetts. On January 11, 1996, the defendant was indicted as an accessory before the fact to murder, G. L. c. 274, § 2. Moure, Carrasquillo, Rosado, and Vega also

---

[4]"Jerry" was Jerry Rodriguez, whom the police had taken into custody because the "Chrome 9" was right below where he had been sitting on the couch.

[5]The information in this section is taken from the record on appeal, and primarily derives from materials submitted in support of the defendant's motion for a new trial.

were charged with the murder of Ramirez or with being an accessory before the fact to her murder. Carrasquillo was tried and found not guilty of murder in June, 1995. Moure was tried and convicted as an accessory before the fact to murder in the first degree in December, 1995. The defendant similarly was tried and convicted as an accessory before the fact to murder in September, 1996.[6]

Rosado, who had been charged with murder and conspiracy to commit murder, later entered into a "cooperation agreement" with the Hampden County district attorney's office, pursuant to which he testified at the three trials just described. Rosado later pleaded guilty to conspiracy and so much of the murder indictment as would constitute manslaughter, and was sentenced to from twelve to fifteen years in State prison. Vega had been charged as an accessory before the fact to murder and conspiracy to commit murder. Vega testified as a witness for the prosecution at the defendant's and Moure's trials. Vega subsequently pleaded guilty to the conspiracy charge and to so much of the accessory charge as would constitute manslaughter, and was sentenced to from nine to ten years in State prison.

The defendant's appeal was entered in this court on February 23, 1998; on September 21, 1998, the court granted a stay of his appeal to allow the defendant to file a motion for a new trial. That motion was not filed in the trial court until May 5, 2008. The trial judge held a nonevidentiary hearing on the motion in March of 2009, and thereafter denied it in a comprehensive memorandum of decision. The defendant's appeals from his conviction and the denial of his new trial motion have been consolidated.

2. *Discussion.* When this court reviews a defendant's appeal from the denial of a motion for a new trial in conjunction with his direct appeal from an underlying conviction of murder or accessory before the fact to murder in the first degree, we review both under G. L. c. 278, § 33E (§ 33E). See note 1, *supra.* See, e.g., *Commonwealth* v. *Gomez,* 450 Mass. 704, 711 (2008);

---

[6]Following the defendant's conviction and imposition of the sentence on the charge of accessory before the fact to murder, the conspiracy indictment was placed on file without a change of plea, with the defendant's consent.

*Commonwealth* v. *Nieves,* 429 Mass. 763, 770 (1999). See also
*Commonwealth* v. *Randolph,* 438 Mass. 290, 294 & n.8 (2002).

a. *Testimony of Rosado and Vega.* A number of the defend-
ant's claims of error concern the trial testimony of Rosado and
Vega. Specifically, he argues that the prosecutor knowingly and
improperly failed to correct allegedly false testimony by these
witnesses about their cooperation agreements; and his trial
counsel was ineffective in not challenging the admissibility of
Rosado's and Vega's testimony on several different grounds.
The defendant's claims relating to the testimony of Rosado and
Vega were the subject of his motion for a new trial. We review
the motion judge's decision for abuse of discretion, see, e.g.,
*Commonwealth* v. *Goodreau,* 442 Mass. 341, 348 (2004), and
"accord special deference to the action of a motion judge who
was also the trial judge," as in this case. *Commonwealth* v. *Shu-
man,* 445 Mass. 268, 272 (2005). Under § 33E, the standard of
review we apply to both claims focuses on whether the alleged
errors created a substantial likelihood of a miscarriage of justice;
we must examine in particular "whether there was an error . . .
(by defense counsel, the prosecutor, or the judge) and, if there
was, whether that error was likely to have influenced the jury's
conclusion." *Commonwealth* v. *Nieves, supra,* quoting *Com-
monwealth* v. *Mello,* 420 Mass. 375, 393 (1995). See *Com-
monwealth* v. *Wright,* 411 Mass. 678, 682 (1992).

(i) *Claim of prosecutorial misconduct: misleading testimony
concerning nature and terms of cooperation agreement.* At trial,
Rosado testified pursuant to his cooperation agreement with the
district attorney's office. His testimony provided details concern-
ing the May 27, 1994, meeting of Los Solidos members in
Nieves's apartment and statements he heard the defendant make
at that time concerning the mission to kill Ramirez; Rosado's
conversation on May 28 with the defendant, Carrasquillo, and
DeJesus; and the actual execution of the mission on May 28,
including driving the car stolen by Vega to Locust Street where
Ramirez was killed, and the defendant's exit from that car before
Rosado and Carrasquillo reached Locust Street. Vega similarly
testified under his cooperation agreement. His testimony
included, as topics, the May 27 meeting in Nieves's apartment,
the defendant's desire to be elevated to the position of chief

warlord in Los Solidos, and Vega's own role in stealing the car for the mission on the defendant's order.

Rosado stated, in response to questions on direct examination by the prosecutor about Rosado's understanding of his cooperation agreement, that his cooperation would be "taken into consideration," and "for all I know, I'm doing life." On cross-examination he stated that "[t]here was no deal worked out," but confirmed that he was "hoping for some consideration from the District Attorney's office." The defendant asserts that this testimony was false and misleading in relation to the true terms of the agreement that Rosado's counsel in fact had worked out, and the prosecutor's presentment of the false view through Rosado violated the defendant's due process rights. The defendant asserts that Vega failed to reveal that, in exchange for a written statement provided to police on August 26, 1994, the "prosecution team" intervened and postponed for two weeks his being sent to a State prison to serve a sentence imposed in a separate case in a different county, during which time he was held in custody in one and then a second county jail.[7] The defendant argues that Vega's presentation of "false and misleading" testimony concerning his cooperation agreement and the prosecutor's elicitation of this testimony deprived him of the opportunity to inform the jury of issues affecting Vega's bias and credibility.

The motion judge rejected these claims, determining that the entire sum and substance of the Commonwealth's agreement with each witness was that the witness would be given "consideration" in exchange for his testimony, "and nothing more." The judge further concluded that the prosecutor had not misled the jury by declining to correct the witnesses' statements that they were not aware of any "deal" made by their lawyers with

---

[7]On direct examination Vega stated that he received assurances from prosecutors that his cooperation would be taken "into consideration," and that out of concern for his mother's safety she was provided by the police with $500 to assist with her move out of the Springfield area. On cross-examination, Vega further indicated that he was "hoping" for consideration in exchange for his testimony, but that no promises were made in writing and that he had no knowledge of a "deal" entered into on his behalf by his attorney. Nothing about the two-week postponement of his removal to State prison from the jail was mentioned.

the Commonwealth, and that they were only "hoping" for consideration. The judge agreed with the Commonwealth that it would have been reasonably clear to the jury that the witnesses were not suggesting they did not have cooperation agreements, but rather indicating that under the terms of those agreements, the amount of "consideration" — i.e., the actual reduction in the sentences the prosecutor might recommend be imposed after a guilty plea by the witness — was not yet defined.

A defendant's due process rights are violated where the prosecution does not disclose evidence that is material to the issue of guilt, including "[e]vidence tending to impeach the credibility of a key prosecution witness . . . ." *Commonwealth* v. *Hill*, 432 Mass. 704, 715 (2000), quoting *Commonwealth* v. *Collins*, 386 Mass. 1, 8 (1982). "Understandings, agreements, promises, or any similar arrangements between the government and a significant government witness [are] exculpatory evidence that must be disclosed." *Commonwealth* v. *Hill, supra* at 715-716. Furthermore, "where the witness's credibility is a critical issue in the case, the requirements of due process also mandate that the jury be aware of 'evidence of any understanding or agreement as to a future prosecution.' " *Commonwealth* v. *Michel*, 367 Mass. 454, 460 (1975), quoting *Giglio* v. *United States*, 405 U.S. 150, 154-155 (1972).

The record supports the motion judge's analysis and subsequent rejection of the defendant's claims of prosecutorial error and violation of the defendant's due process rights. There is no dispute that the prosecutor informed the defendant's counsel before trial that both Rosado and Vega had entered cooperation agreements with the Commonwealth. Moreover, the prosecutor explicitly stated in his opening that both Vega and Rosado had done so, and made the point again in his direct examination of each witness. As the judge found, nothing in the record indicates there was any specificity to either cooperation agreement beyond a commitment by the district attorney that "consideration" would be given to the witness with respect to resolution of the pending charges against him after he testified.[8] Contrast *Commonwealth* v. *Hill, supra* at 710-713, 713-714 (upholding motion

---

[8]We do not agree with the defendant that the Commonwealth violated its obligation to inform the defendant of the terms of Vega's cooperation agreement

judge's conclusion that Commonwealth had promised to dismiss or at least reduce specific drug charges against witness in consideration for his testimony at defendant's trial but had not disclosed existence or terms of agreement to defendant; order granting new trial affirmed). Any equivocation by Rosado or Vega concerning the terms of his cooperation agreement appeared to reflect the witness's uncertainty regarding the exact contours of the consideration he would receive. As the motion judge noted, this court has recognized that "the very nature of the situation may well require that [the agreement's] terms be vague as the consideration given may be dependent on the degree of cooperation." *Id.* at 716.

(ii) *Admissibility of Rosado's testimony.* The defendant argues that Rosado improperly agreed to testify to a specific version of events in exchange for consideration, irrespective of the truth.[9] During the investigation into Ramirez's murder, Rosado provided three written statements to police. On cross-examination, he conceded that the first and second statements were mostly "lies," but that his third and final statement, provided on September 29, 1994, was truthful. The defendant argues that a review of Rosado's testimony at the earlier murder trial of Jose Carrasquillo would have revealed that in exchange for "consideration," Rosado agreed to testify in conformity with his final statement to police without regard for its truth, and the terms of this agreement rendered his testimony inadmissible under this court's unrelated decision in *Commonwealth* v. *Rosado,* 408

when it did not disclose the two-week postponement of Vega's move into the State prison system. The record suggests the Commonwealth arranged for the postponement for its own benefit — easier access to the witness in order to prepare for trial — and not in consideration of Vega's agreement to testify. Furthermore, the "opportunity" to spend two weeks in the custody of a sheriff rather than the Department of Correction while serving a long sentence hardly seems the type of preferential treatment or benefit that would be likely to influence a witness's testimony.

[9]The defendant frames this argument as an ineffective assistance of counsel claim — that his trial counsel failed to challenge the admissibility of Rosado's testimony on the ground that the witness had agreed with the Commonwealth to testify only to a specified version of events without regard to whether it was true. We need not focus specifically on counsel's performance but consider whether there was an error in admitting the testimony of Rosado, and, if so, whether the error "was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright,* 411 Mass. 678, 682 (1992).

Mass. 561, 565 (1990).[10] In the defendant's view, his trial counsel failed to pick up on this fatal flaw in Rosado's testimony, with the result that counsel improperly failed to challenge its admissibility in the defendant's trial.

As indicated, the defendant presented this claim in his motion for a new trial. The judge reviewed the portion of Rosado's testimony in the Carrasquillo trial on which the defendant premised his claim in the context of the entirety of Rosado's testimony at that trial,[11] and concluded that "a fair reading of Rosado's entire testimony is that he was testifying in conformity with his final statement not because he had promised to stick to it under any and all circumstances without regard to its truth or falsity, but simply because it was truthful." The judge went on to reason that at the Carrasquillo trial, very competent defense counsel had never sought to exclude Rosado's testimony on the basis that Rosado had agreed, impermissibly, to testify in a particular way without reference to the truth, or even raised the issue at all; similarly, in the trial of Miguel Moure, no such claim had been raised at trial or on appeal,[12] and that at the defendant's trial as well as, on a more extensive basis, at Moure's trial, Rosado had testified that his final statement to the police was the truth.

The judge's consideration of what approach was taken to Rosado's similar testimony introduced at the two previous and related trials was appropriate. See *Commonwealth* v. *Rosado*, 408 Mass. at 563-565. Moreover, our own reading of the transcripts of Rosado's testimony at the Carrasquillo and Moure trials[13] supports the judge's view that Rosado had not agreed, as the condition of receiving prosecutorial "consideration" in his own case, to testify to the contents of his third statement regardless of whether it was true.[14] There was no error in the admis-

---

[10] In *Commonwealth* v. *Rosado*, 408 Mass. 561, 565 (1990), this court stated that "an agreement to testify in a particular way, without reference to the truth, is plainly an improper agreement; is inadmissible over objection; and, over objection, would bar the testimony of a witness who had made such an agreement, as long as that agreement remained in effect."

[11] The judge in this case also had been the trial judge in the Carrasquillo case.

[12] See *Commonwealth* v. *Moure*, 428 Mass. 313 (1998).

[13] The defendant's appellate counsel included copies of the transcripts of Rosado's testimony at the two earlier trials in the record appendix in this case.

[14] We agree also with the judge that the affidavit filed by the defendant's

sion of Rosado's testimony at the defendant's trial, and his counsel was not ineffective for failing to challenge it.

(iii) *Voluntariness of Vega's statements.* The defendant argues that Vega's trial testimony should have been suppressed and not presented at trial because it was derived from Vega's statements to the police that were made involuntarily.[15] The motion judge stated that there was some support in the record for the finding that Vega[16] was pressured and threatened at the hands of the police before he gave his initial statement, but the police actions "fell far short" of the type of misconduct that would justify exclusion of Vega's testimony at the defendant's trial.[17]

As a general matter, "persons not themselves the victims of illegal government conduct typically lack standing to assert the constitutional rights of others." *LaFrance* v. *Bohlinger*, 499 F.2d 29, 34 (1st Cir.), cert. denied sub nom. *LaFrance* v. *Meachum*, 419 U.S. 1080 (1974). Cf. *Blixt* v. *Blixt*, 437 Mass. 649,

---

trial counsel in the present case, stating that counsel was unaware of this court's *Rosado* decision at the time of the defendant's trial, is not dispositive; the affidavit does *not* state that trial counsel believed Rosado to be testifying that he had agreed to testify in conformity with his September 29 statement without regard for the truth, and in any event, we have concluded that such an interpretation is not supported by the record.

[15]As with his claim about Rosado's testimony, the defendant presents this claim about Vega under the heading of ineffective assistance of counsel, but we focus on the underlying error asserted, namely, that Vega's trial testimony was inadmissible because it was the product of coercion. See note 9, *supra.*

[16]The defendant included in his motion for a new trial a claim that Rosado's statements to the police were also the product of coercion; the motion judge addressed the two claims of coercion together. The defendant does not repeat the argument about Rosado on appeal. We discuss only Vega here, but note that in conducting our review of the entire record under G. L. c. 278, § 33E, we have not found significant evidence supporting a claim that Rosado's statements to the police were the product of coercion and inadmissible on that ground — assuming the defendant would have standing to raise such a claim.

[17]The record contains several documents that relate to Vega's statements to the police, including his motion to suppress evidence of his statements, the related memorandum of his counsel, and his own supporting affidavit; an excerpt of Vega's testimony in the Moure trial; and his testimony in this trial. We have reviewed these documents, and find in them allegations of being denied counsel by the police, but no allegations of physical violence by the police. Based on the record before us, whatever mistreatment Vega may have suffered at the hands of the police, we agree with the motion judge that the alleged mistreatment would not warrant the exclusion of Vega's testimony at the defendant's trial.

661 (2002), cert. denied, 537 U.S. 1189 (2003) (party challenging statute on equal protection grounds may generally not claim standing to vindicate third party's constitutional rights). A basis for excluding evidence does exist where it is derived from government misconduct that is "distinctly egregious." See *Commonwealth* v. *Scardamaglia*, 410 Mass. 375, 380 (1991). We agree with the motion judge that the record contains no evidence suggesting that Vega was subject to "extreme coercion or torture," *id.* at 378 n.1, or to "distinctly egregious" conduct at the hands of police. *Id.* at 380. See note 17, *supra.* In addition, as the judge observed, Vega's testimony at the defendant's trial came two years after his alleged mistreatment by the police, and he entered into the cooperation agreement with the district attorney's office only after he was represented and advised by independent counsel — factors that removed or at least mitigated any taint associated with the earlier alleged mistreatment by police.[18] As with Rosado, we find no error associated with the admission of Vega's testimony at the defendant's trial, and therefore, no ineffectiveness of counsel.[19]

b. *Consciousness of guilt instruction.* At trial, the judge, over the defendant's objection, instructed the jury on consciousness of guilt. On appeal, the defendant challenges the fact that the instruction was given, as well as its contents. His challenge to

[18]The defendant also claims that his trial counsel was ineffective for failing, during Vega's cross-examination, to use Vega's claims that his statements were involuntary. However, we again agree with the motion judge that this argument fails because defense counsel effectively cross-examined Vega and elicited from him some testimony concerning possible mistreatment at the hands of police.

[19]In connection with his general claim, the defendant argues that his counsel's ineffective representation deprived him of a more favorable standard of review of various claims (not "preserved" by counsel), because his claims are subject to review under the substantial likelihood of a miscarriage of justice standard, rather than the harmless beyond a reasonable doubt standard of *Chapman* v. *California*, 386 U.S. 18, 24 (1967). In advancing this argument, the defendant focuses in particular on the admission of the testimony of Rosado and Vega. We need not address the defendant's claim because, as discussed, we have found no error in the admission of this testimony. We note, however, that the defendant's argument runs contrary to the approach taken to ineffective assistance of counsel claims in both Federal and Massachusetts courts. See *Padilla* v. *Kentucky*, 130 S. Ct. 1473, 1482 (2010), quoting *Strickland* v. *Washington*, 466 U.S. 668, 688, 694 (1984); *Commonwealth* v. *Saferian*, 366 Mass. 89, 96-97 (1974).

the fact of the instruction was preserved, and therefore we review the claim for prejudicial error. See, e.g., *Commonwealth v. Siny Van Tran*, 460 Mass. 535, 556 (2011); *Commonwealth* v. *Stuckich*, 450 Mass. 449, 453 (2008). We review the contents of the instruction under § 33E to determine whether, if there was error, it created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. at 682.

A consciousness of guilt instruction is permissible where "there is an 'inference of guilt that may be drawn from evidence of flight, concealment, or similar acts,' such as false statements to the police, destruction or concealment of evidence, or bribing or threatening a witness." *Commonwealth* v. *Stuckich*, 450 Mass. at 453, quoting *Commonwealth* v. *Toney*, 385 Mass. 575, 584 n.4 (1982). Furthermore, "[f]light is perhaps the classic evidence of consciousness of guilt." *Commonwealth* v. *Carrion*, 407 Mass. 263, 277 (1990). See *Commonwealth* v. *Toney, supra* at 583 ("Evidence that a person flees from the scene of a crime or from his usual environs may be probative of a consciousness of guilt regardless of whether he has actual knowledge that he is being sought by the police"). Here, the evidence showed that when the police came to Nieves's apartment on June 20, 1994, the defendant was holding the "Chrome 9" and hastily took steps to hide it; the defendant was upset when the police found and seized the weapon, stating to his compatriots that it was the gun used to kill Ramirez; the "Chrome 9" in fact was shown by forensic testing to have been the murder weapon; the defendant did not return to Nieves's apartment after June 20; and he left Massachusetts for Puerto Rico within a few weeks, not to return until approximately one year later, under arrest for conspiracy to commit the murder of Ramirez. Although it is true that the "Chrome 9" weapon is not directly connected to the charge of accessory before the fact to murder of Ramirez, its link to the crime is obvious, and the jury could infer that the defendant was worried that seizure of the weapon used in the murder would connect him to the crime. That the defendant did not leave Springfield until some weeks after June 20 is not dispositive. See *Commonwealth* v. *Siny Van Tran*, 460 Mass. at 553 (three weeks between murder and defendant's flight justified consciousness of guilt instruction). Furthermore, the defendant's alternate explana-

tion for his trip to Puerto Rico did not detract from the sufficiency of the evidence of consciousness of guilt, but rather created a jury question. See *Commonwealth* v. *Prater*, 431 Mass. 86, 97 (2000), citing *Commonwealth* v. *Booker*, 386 Mass. 466, 470-471 (1982) ("When there are multiple possible explanations for a defendant's flight, it is for the jury to decide if the defendant's actions resulted from consciousness of guilt or some other reason"). The judge did not abuse his discretion or commit other error of law in instructing the jury on consciousness of guilt.

We turn to the contents of the instruction given. The defendant argues that the judge misstated vital facts when he told jurors that they had "heard evidence suggesting that the defendant may have fled from Massachusetts *after he discovered that he was about to be charged with the offense for which he is now on trial*" (emphasis added). As just stated, the evidence at trial would permit an inference that as of June 20, 1994, the defendant was aware the police might connect him in some way to the murder of Ramirez, but we agree that there was no evidence the defendant fled the Commonwealth "after he discovered that he was about to be charged" with accessory before the fact to murder; this portion of the judge's charge was erroneous.[20] See *Commonwealth* v. *Tu Trinh*, 458 Mass. 776, 782 (2011).

Despite this error, no substantial likelihood of a miscarriage of justice was created because the judge's misstatement of the evidence was unlikely to have influenced the jury's decision.[21] See *Commonwealth* v. *Dyer*, 460 Mass. 728, 742 n.21 (2011), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

---

[20]Indeed, it would be impossible for such evidence to exist, given that the defendant was not charged with the crime of accessory before the fact to murder until eighteen months later, in January, 1996.

[21]The defendant asserts that this misstatement constituted structural error not subject to a harmless error analysis, citing *Arizona* v. *Fulminante*, 499 U.S. 279, 309-310 (1991). The *Fulminante* decision does not aid the defendant. In that case, a majority of the Supreme Court concluded that the admission of an involuntary confession is a type of trial error subject to harmless error analysis. *Id.* at 295. In a brief passage, the Court distinguished *Tumey* v. *Ohio*, 273 U.S. 510 (1927), in which the Court had concluded that the partiality of a judge constituted structural error that defied harmless error analysis. *Arizona* v. *Fulminante*, *supra* at 309-310. Here, the defendant does not argue, and there is no evidence, that the trial judge was not impartial or was in any way biased.

Immediately after the misstatement quoted above, the trial judge reemphasized the jurors' exclusive role as fact finders,[22] and told them that he mentioned the evidence "only to illustrate the legal point involved," namely, that evidence of flight, if proved by the Commonwealth, might be considered by them as evidence of consciousness of guilt, although there were other, innocent explanations of and inferences to be drawn from flight if the jury found it to have occurred — in other words, all the considerations set forth by this court in *Commonwealth* v. *Toney*, 385 Mass. at 585-586 & n.6. We are confident that the judge's comprehensive consciousness of guilt instruction was sufficient to insulate the jury from the erroneous misstatement. See *Commonwealth* v. *Tu Trinh*, 458 Mass. at 782. Moreover, the case against the defendant was strong; the evidence suggesting flight was a small part of the evidence introduced by the Commonwealth.

c. *Ineffective assistance of counsel.* We have reviewed a number of the defendant's ineffective assistance claims in earlier sections of this opinion; we consider the remaining claims here. The defendant argues that the decision of trial counsel to call as a defense witness Ricardo Negron, a newly-joined member of Los Solidos in May of 1994, was manifestly unreasonable and constituted constitutionally ineffective assistance of counsel. See *Commonwealth* v. *Zagrodny*, 443 Mass. 93, 102 (2004), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998) ("A decision whether and when to call a witness is a matter of tactical strategy, giving rise to error only when the decision to call the witness was 'manifestly unreasonable when made' "). This is a relatively high burden: "Only 'strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent' are manifestly unreasonable." *Commonwealth* v. *Zagrodny*, *supra* at 98, quoting *Commonwealth* v. *Levia*, 385 Mass. 345, 353 (1982). If counsel's behavior falls below this threshold, we evaluate whether the resulting error

[22]The judge stated: "Now, I'm not saying [evidence (i.e., evidence suggesting that 'the defendant may have fled from Massachusetts after he discovered that he was about to be charged with the offense for which he is now on trial')] is the fact or you should find that to be a fact. The facts are entirely your business and not mine. There was some evidence to that effect which you may accept or reject, as you see fit . . . ."

resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Nieves*, 429 Mass. 763, 770 (1999).

Here, the motion judge found that counsel's decision to call Negron could not be deemed manifestly unreasonable, because counsel believed, based on the interview his investigators conducted with Negron, that Negron would testify that no meeting occurred in Nieves's apartment on May 27, 1994 — testimony that could reasonably be thought to help undermine the Commonwealth's theory of the case and the credibility of the various witnesses called by the Commonwealth who testified that the plan to murder Ramirez was formed on May 27, and the defendant was the one who gave the orders to carry it out.[23] The judge also found that counsel believed, again based on his investigators' interview, that Negron would testify he was shot before Ramirez was killed — testimony that had the potential of undermining the Commonwealth's theory that Negron was shot in retaliation for the murder of Ramirez by individuals who were members of La Familia.

It is true that Negron did not testify wholly as the defendant's trial counsel expected. The defendant on appeal argues that Negron's testimony "effectively destroyed the defense," and even if Negron had testified in accordance with the report provided to defense counsel by his investigators, the effect "would have been only slightly less devastating." These broad, conclusory statements do not persuade us that the motion judge's characterization of defense counsel's decision to call Negron was in error; as the judge stated, in the end, while one might conclude that Negron had not helped the defendant and even may have harmed his case, such an "observation is made with the benefit of 20/20 hindsight." But what matters in evaluating counsel's trial strategy is whether the plan to call Negron was unreasonable *"when made"* (emphasis added). *Commonwealth*

---

[23]Negron also told the investigators, and testified at trial, that he heard about a plan to kill Ramirez from two other Los Solidos members, and not from the defendant; indeed, his trial testimony was that he overheard these two members tell the defendant about the plan in a conversation that occurred several days before the murder, not on May 27. This testimony, if believed, would suggest that the defendant played a less central role in relation to the conception and implementation of a plan to murder Ramirez, and was accordingly less culpable, than the Commonwealth sought to have the jury believe.

v. *Zagrodny*, 443 Mass. at 102. We agree with the judge that it was not.

d. *Prosecutor's opening statement and closing argument.* The defendant argues that the prosecutor made several improper assertions and arguments in his opening statement and closing argument that, considered together, deprived the defendant of a fair trial and require reversal of his conviction. He takes exception in particular to what he describes as the prosecutor's (1) repeated, inflammatory references to and characterizations of gangs and the defendant's immersion in the violent gang world — a tactic, the defendant contends, that improperly urged guilt by association; (2) unjustified attacks on the defendant's counsel; and (3) insertion and use of facts not in evidence. We analyze the defendant's claim "in light of the entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial." *Commonwealth* v. *Rodriguez*, 437 Mass. 554, 565 (2002), quoting *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984). Taken as a whole, we conclude that the prosecutor's closing does not warrant reversal. See *Commonwealth* v. *Caillot*, 454 Mass. 245, 258 (2009), cert. denied, 130 S. Ct. 1527, and cert. denied sub nom. *Santos* v. *Massachusetts*, 130 S. Ct. 1525 (2010).

(i) The prosecutor's opening statement, and to a greater extent, his closing argument, included vivid characterizations of gangs and what he described as gang life and the world of gangs — in his words, life "inside the belly of the beast." Enthusiastic rhetoric is permissible, see, e.g., *Commonwealth* v. *Costa*, 414 Mass. 618, 629 (1993); the prosecutor's rhetoric was perhaps at, but not over, the edge of proper argument. The prosecutor appeared to focus on the nature of the "gang world" because in addition to the defendant, a number of critical witnesses for the Commonwealth — including Rosado and Vega — were themselves part of the Los Solidos gang, and the prosecutor was acknowledging and dealing with this reality directly. Moreover, the Commonwealth's case centered on gang affiliations and the "war" between Los Solidos and La Familia. It is also significant that the judge included in his final instructions a very forceful admonition to the jury that they could not find the defendant guilty because he was a member of a gang, and that the evidence of gang membership was relevant only on the

question of motive. See *Commonwealth* v. *Smith*, 450 Mass. 395, 399, cert. denied, 555 U.S. 893 (2008) (evidence of gang affiliation permitted on issues of motive and joint venture).

(ii) In his closing, the prosecutor stated that members of La Familia "knew" that Ramirez had been killed by members of Los Solidos, and in effect told the jury that Negron was shot shortly after the Ramirez murder by La Familia members seeking to avenge the killing. Defense counsel did not object to this assertion. We agree with the defendant that there was an insufficient factual foundation for the inference asserted by the prosecutor, namely, that within one hour after Ramirez's murder, La Familia members had substantive knowledge that Los Solidos was responsible for the murder, and La Familia therefore shot Negron in retaliation. Even if the evidence were sufficient to support an inference that La Familia members harbored suspicions of Los Solidos members' involvement in Ramirez's death, it was improper for the prosecutor to suggest that these suspicions equated with proof that members of Los Solidos were in fact responsible for the murder. However, the prosecutor's improper statement warrants reversal only if it prejudiced the defendant in light of the prosecutor's entire argument, the trial testimony, and the judge's instructions to the jury. *Commonwealth* v. *Caillot*, 454 Mass. at 258. We find no prejudice here. The prosecutor's suggestion about La Familia's responsibility for shooting Negron and what it meant, although improper, was a relatively brief point of focus in his argument. Moreover, the suggestion was that La Familia knew that Los Solidos was responsible for the murder, not specifically the defendant. The judge's instructions made clear that the jury must find the Commonwealth had proved the elements of the crime charged with respect to the defendant himself, not Los Solidos as a whole.[24]

e. *Additional issues.* We briefly discuss two additional issues

---

[24]There is one additional aspect of the prosecutor's closing that deserves comment. The prosecutor stated, in what appeared to be a reference to defense counsel, that he (defense counsel) had "slap[ped] those brave men [i.e., police officers] around," conduct that the prosecutor characterized as "almost indecent." It is unclear whether the prosecutor was referring to defense counsel's cross-examination of the police officers or an unrelated comment that counsel made in his closing argument. In any event, the prosecutor's statement was improper. See *Commonwealth* v. *Tu Trinh*, 458 Mass. 776, 788-789 (2011). See also *Commonwealth* v. *Grandison*, 433 Mass. 135, 143 (2001) ("improper

raised by the defendant. First, to the extent that the prosecutor may have cross-examined the defendant improperly concerning whether he could have been charged with another crime, defense counsel's objection to this line of questioning was sustained, and the prosecutor did not raise the issue in his closing argument. Second, in his reply brief, the defendant argues that the motion judge abused his discretion in denying the defendant's request for limited discovery and an evidentiary hearing as part of his effort to investigate DeJesus's role in the Ramirez murder. Having reviewed the record, we discern no error. See *Commonwealth* v. *DeVincent*, 421 Mass. 64, 67 (1995) (appellate courts generally defer to sound discretion of trial judge in determining whether motion for new trial requires evidentiary hearing). Furthermore, "[w]hen the motion judge is also the trial judge, as in this case, [he] may use [his] 'knowledge and evaluation of the evidence at trial in determining whether to decide the motion for a new trial without an evidentiary hearing.' " *Commonwealth* v. *Morgan*, 453 Mass. 54, 64 (2009), quoting *Commonwealth* v. *Wallis*, 440 Mass. 589, 596 (2003). See *Commonwealth* v. *Mercado*, 452 Mass. 662, 673 (2008).

f. *Review under G. L. c. 278, § 33E.* In conducting our review

---

for the prosecutor to suggest to the jury that it was impermissible for defense counsel to question the veracity of the police officers . . . . That is the essence of cross-examination"). However, the prosecutor's statement does not constitute reversible error. It was a very brief comment made in passing during a long closing argument that was focused on other themes and points, and that was otherwise proper. We do not think this single comment reasonably could be thought to have affected the jury's decision.

None of the defendant's other arguments concerning the prosecutor's opening statement or closing argument has merit. The prosecutor did not vouch improperly for the credibility of several prosecution witnesses. Improper vouching occurs where an attorney "expresses a personal belief in the credibility of a witness . . . or . . . indicates that he or she has knowledge independent of the evidence before the jury verifying a witness's credibility." *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265 (1989), and cases cited. No such assurances were made here. The prosecutor did not insinuate any facts not present in the evidentiary record. The defendant's contention appears to be based on a misreading of what the prosecutor was stating with respect to the witnesses John Matos and Vega. We find no misstatement, and in any event, these challenged remarks did not go to "the heart of the case" and could not "possibly [have] made a difference in the jury's conclusions." *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 807 (2009), and cases cited. The trial judge properly instructed the jury that neither opening statements nor closing arguments constituted evidence. See *id.* at 806-807.

of the entire case under § 33E, we find no basis to reverse the defendant's conviction, but add one comment on an issue not raised by the defendant. In his final instructions to the jury, the trial judge addressed the topic of witness credibility generally, and added as part of the instruction that the jurors could "consider any cooperation agreements, requests for consideration of a lower sentence or offers of assistance by the commonwealth . . . ."[25] The judge did not include any further instruction concerning the need to evaluate the credibility of a witness who was a party to a cooperation agreement with the government with any particular or special care. It would have been preferable for the judge to give a fuller and more cautionary instruction to the jury about their evaluation of Rosado's and Vega's testimony. See *Commonwealth* v. *Davis*, 52 Mass. App. Ct. 75, 78 (2001) ("Also problematic is the fact that the judge here failed to instruct the jury that a witness's agreement to provide testimony in exchange for consideration with respect to pending charges does not constitute governmental endorsement of the witness's veracity"). Cf. *Commonwealth* v. *Ciampa*, 406 Mass. at 263-264, 266 (discussing proper handling of witness's plea agreement "contingent on the witness's telling the truth" at defendant's trial).[26] Cf. also *Commonwealth* v. *Fuller*, 421 Mass. 400, 413 (1995) (discussing jury instruction on evaluating cred-

---

[25]The judge's instruction on witness credibility was the following: "Now, as I told you, your function is to assess the credibility of the witnesses. In determining credibility, you should consider the conduct and the demeanor of the witness while testifying, the frankness or lack of frankness while testifying, the reasonableness or unreasonableness of the testimony, the probability or improbability of the testimony, the opportunity or the lack thereof to see or know the facts concerning which the witness testified, the accuracy of the witness's memory, the degree of intelligence shown by the witness. You should consider the character and the appearance of the witness here at trial as well as any bias that he or she may have shown. *You may consider any cooperation agreements, requests for consideration of a lower sentence or offers of assistance by the commonwealth to a witness in evaluating the witness's credibility* [emphasis added].

"Now, members of the jury, you have enormous power in this regard. You can choose to believe everything a witness says, nothing a witness says or anything in between those two extremes."

[26]*Commonwealth* v. *Ciampa*, 406 Mass. at 263-264, instructs that when a government witness testifies pursuant to a plea agreement contingent on telling the truth, the judge should direct the jury's attention to the potential influence of the plea agreement on the witness's credibility, and should convey the

ibility of immunized witness). The terms of the cooperation agreements that the Commonwealth had entered into with Rosado and Vega unquestionably were different than the plea agreement at issue in *Ciampa*; as discussed earlier, the defendant challenges at least one of these agreements because, in contrast to the agreement in *Ciampa*, it did *not* include an explicit requirement that the witness (Rosado) testify truthfully. Nonetheless, given the circumstances — both witnesses had themselves been charged with committing or being an accessory to the murder of Ramirez — it would have been preferable for the judge to give a fuller and more cautionary instruction to the jury about their consideration of Rosado's and Vega's testimony. We conclude, however, that the judge's instruction, as given, does not constitute an error requiring reversal of the defendant's conviction. The jury were apprised of the terms of the cooperation agreements to which Rosado and Vega were parties, and all participants at the trial — the prosecutor, the defendant's counsel, and the judge — emphasized that both witnesses were testifying pursuant to those agreements. There is no likelihood that a more pointed instruction on the jurors' need to view the testimony of these two witnesses with particular caution and to make their own judgments about whether the witnesses were testifying truthfully "was likely to have influenced the jury's conclusion" about the witness's credibility. See *Commonwealth* v. *Wright*, 411 Mass. at 682.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*

---

need to view such testimony with caution. *Id.* at 263. In particular, the judge's instruction should "focus the jury's attention on the incentives that could have influenced [the witness's] testimony[;] warn the jury that, in entering into the agreement and presenting him as a witness, the government did not know whether [the witness] was telling the truth[;] and . . . emphasize that [the witness's] truthfulness was solely a question for the jury to decide." *Id.* at 264.